# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ANTHONY DAUNT;

TOM BARRETT;

AARON BEAUCHINE;

KATHY BERDEN;

STEPHEN DAUNT;

GERRY HILDENBRAND;

GARY KOUTSOUBOS;

LINDA LEE TARVER;

PATRICK MEYERS;

MARIAN SHERIDAN;

MARY SHINKLE;

NORM SHINKLE;

PAUL SHERIDAN;

BRIDGET BEARD;

CLINT TARVER,

              Plaintiffs,

    v.

JOCELYN BENSON, in her official
Capacity as Michigan
Secretary of State,

              Defendant.

Case No.

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Plaintiffs Anthony Daunt, Tom Barrett, Aaron Beauchine, Kathy Berden, Stephen Daunt, Gerry Hildenbrand, Gary Koutsoubos, Linda Lee Tarver, Patrick Meyers, Marian Sheridan, Mary Shinkle, Norm Shinkle, Paul Sheridan, Bridget Beard, and Clint Tarver, (collectively, "Plaintiffs") for their Complaint against Defendant Jocelyn Benson, in her official capacity as Michigan Secretary of State, ("Defendant") state and allege as follows:

## INTRODUCTION

1.     This action challenges on federal constitutional grounds the newly created Michigan Citizens Redistricting Commission ("Commission") because it excludes Michigan citizens from serving on the Commission if they have engaged in certain categories of constitutionally protected activity deemed to be "partisan" in nature. The Commission is responsible for developing and adopting a redistricting plan for state legislative and federal congressional districts. It was established pursuant to amendments to the State's constitution approved by voters through a statewide ballot proposal on the November 2018 general election ballot. The new constitutional provisions include a provision requiring that each Commissioner "not currently be or in the past 6 years have been any of the following: a declared candidate for . . . partisan office; an elected official to partisan . . . office; an officer or member of the governing body of a . . . political party; a paid consultant or employee of a[n] . . . elected official or political candidate, of a .

. . political candidate's campaign, or of a political action committee; an employee of the legislature; a [state-registered] lobbyist agent, . . . or any employee of such person; [a politically appointed state employee]; [or] a parent, . . . child, . . . or spouse of any individual [falling into these categories]". Mich. Const. art. IV, § 6(1)(B) and (C).

2.    Plaintiffs are individuals who are excluded from serving on the Commission because they fall into one or more of these eight categories. Michigan's creation of that ineligibility violates the First Amendment to the United States Constitution and denies Plaintiffs equal protection of law under the Fourteenth Amendment. Accordingly, Plaintiffs seek a declaration that the exclusionary criteria set forth in Article IV, Section 6(1)(B) and (C) of Michigan's Constitution is unconstitutional and, further, that the entire Commission must be invalidated because the challenged provision is inseparable from the remainder of the provisions establishing and implementing the Commission. Plaintiffs also seek a preliminary injunction directing the Secretary of State to suspend her implementation of all provisions of the Michigan Constitution relating to the Commission.

3.    The constitutional importance of the principles of free speech and political association that are at stake in this matter is well established by the Supreme Court. "[P]olitical belief and association constitute the core of those

activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976).

4.       In particular, Supreme Court precedent dictates that a governmental or state actor "conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so." *Vickery v. Jones*, 856 F. Supp. 1313, 1322 (S.D. Ill. 1994). "Accordingly, regardless of whether a particular job is temporary or permanent, the government must demonstrate (1) a vital government interest that would be furthered by its political hiring practices; and (2) that the patronage practices are narrowly tailored to achieve that government interest." *Id.*

5.       Applying this level of scrutiny to the challenged provisions of the Michigan Constitution, there is not a sufficient "fit" between the exclusion of Plaintiffs and the asserted interests of transparency, impartiality, and fairness that motivated the establishment of the Commission. In particular, the selection system may actually inhibit transparency, impartiality, and fairness because eligible applicants may be no less partisan than those who fall into the excluded categories. Moreover, there is no government interest  sufficiently vital to justify the distinction drawn by the challenged  provisions. As such, the burden that the exclusion places on Plaintiffs' constitutionally  protected  political  activity,

association, speech, and right to petition, is not justified.

6.      In addition, the exclusionary criteria run afoul of the Equal Protection Clause of the Fourteenth Amendment because they burden categories of individuals based on perceived "partisan" biases, but impose no restriction on individuals whose partisan biases may be stronger but who do not fall into one of the excluded categories.

## PARTIES

7.      Plaintiff Anthony Daunt has served as a registered lobbyist agent in the State of Michigan since August 27, 2013. Since 2017, Plaintiff Daunt has served as an officer and member of the governing body of the Clinton County Republican Party. Since April 18, 2017, Plaintiff Daunt has served as a member of the governing body of the Michigan Republican Party committee.

8.      Plaintiff Tom Barrett became a declared candidate for partisan State office as a candidate for the Office of State Representative on September 13, 2017. In November 2018, Plaintiff Barrett was elected to the Michigan State Senate and his current term of office began on January 1, 2019.

9.      Plaintiff Aaron Beauchine became a declared Republican candidate for Ingham County Commissioner, a partisan office, on March 15, 2018.

10.      Plaintiff Kathy Berden has served as the national committeewoman of the Republican Party since 2016.

11. Plaintiff Stephen Daunt has been an employee of the Michigan Legislature since January 1, 1991.

12. Plaintiff Gerry Hildenbrand has been a member of a governing body of a national, state, or local political party since 2017.

13. Plaintiff Gary Koutsoubos was a consultant to a candidate(s) for federal, state or local office or a political action committee since July 8, 2017. Between March 2014 and June 2017, Plaintiff Koutsoubos was an unclassified state employee.

14. Plaintiff Linda Lee Tarver serves as President of the Republican Women's Federation of Michigan, a voting member of the Michigan Republican Party's State Central Committee and therefore, is an officer or member of a governing body of a national, state or local political party. Plaintiff Linda Lee Tarver is elected to and serve as a Republican Precinct Delegate. It is possible that the Michigan Secretary of State may determine that Plaintiff Linda Lee Tarver, as elected precinct delegate, may qualify as an elected official to partisan office.

15. Plaintiff Patrick Meyers has been a paid consultant to a candidate(s) for federal, state, or local office or a political action committee since 2010.

16. Plaintiff Marian Sheridan was a member of a governing body of a state political party since February of 2019.

17.     Plaintiff Mary Shinkle was an employee of former Congressman Mike Bishop, a federal elected official between 2015 and 2018. Since November 29, 2018, Plaintiff Mary Shinkle has served as the Vice Chair of the Ingham County Republican Party, a local political party. Since February of 2017, Plaintiff Mary Shinkle's spouse, Norm Shinkle, has served as the 8th Congressional District Chair of the Michigan Republican Party and as a member of their governing State Central Committee. Plaintiff Mary Shinkle is elected to and serves as a Republican Precinct Delegate.  It is possible that the Michigan Secretary of State may determine that Plaintiff Mary Shinkle, as elected precinct delegate, may qualify as an elected official to partisan office.

18.     Plaintiff Norm Shinkle was an officer or member of a governing body of state political party since February of 2017. Between 2015 and 2018, Plaintiff Norm Shinkle's spouse, Mary Shinkle, was an employee of former Congressman Mike Bishop, a federal elected official. Since November 29, 2018, Plaintiff Norm Shinkle's spouse, Mary Shinkle, served as the Vice Chair of the Ingham County Republican Party, a local political party. Plaintiff Norm Shinkle is elected to and serve as a Republican Precinct Delegate.  It is possible that the Michigan Secretary of State may determine that Plaintiff Norm Shinkle, as elected precinct delegate, may qualify as an elected official to partisan office.

19.     Plaintiff Paul Sheridan's parent, Marian Sheridan, has been the

Grassroots Vice Chair of the Michigan Republican Party since February of 2019, and therefore a member of a governing body of a state political party.

20. Plaintiff Bridget Beard's parent, Marian Sheridan, has been the Grassroots Vice Chair of the Michigan Republican Party since February of 2019, and therefore a member of a governing body of a state political party.

21. Plaintiff Clint Tarver's spouse, Linda Lee Tarver, serves as President of the Republican Women's Federation of Michigan, a voting member of the Michigan Republican Party's State Central Committee and therefore, is a member of a governing body of a state political party. Plaintiff Clint Tarver is elected to and serves as a Republican Precinct Delegate. It is possible that the Michigan Secretary of State may determine that Plaintiff Clint Tarver, as elected precinct delegate, may qualify as an elected official to partisan office.

22. Defendant Jocelyn Benson is the Michigan Secretary of State and is being sued in her official capacity. As Secretary of State, Ms. Benson is the "chief election officer of the state" and is thereby responsible for overseeing the conduct of elections. Mich. Comp. Laws § 168.21. Pursuant to Article IV, Section 6 of the Michigan Constitution, these responsibilities include overseeing the selection process for the state's newly created Commission and serving as secretary of the Commission. Mich. Const. art. IV, § 6 (2), (4), (7).

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C.

§ 2201; 28 U.S.C. § 2202; 28 U.S.C. § 1331; 28 U.S.C. § 1343 (a)(3), (4); 42 U.S.C.

§ 1983; 42 U.S.C. § 1988.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b)(2).

## ALLEGATIONS

### Michigan Ballot Proposal 18-2 (Citizens Redistricting Commission)

25.     Every 10 years following the decennial United States Census, Michigan

adjusts its state legislative and congressional district boundaries based on the population

changes reflected in the census. Until November 2018, the Michigan Legislature redrew

the congressional and state legislative district boundaries. Redistricting plans were

adopted if approved by a simple majority vote in both chambers of the state legislature

and subsequently signed by the Governor. The state legislature last approved new

congressional district boundaries on June 29, 2011, and the governor signed them into

law on August 9, 2011.[1]

---

[1] The 2011 redistricting plan is the subject of ongoing litigation in the United States District Court for the Eastern District of Michigan. *See League of Women Voters of Michigan v. Benson*, No. 2:17-cv-14148 (E.D. Mich. filed Dec. 27, 2017). In December 2017, the League of Women Voters of Michigan filed suit in federal court alleging that Michigan's congressional and state legislative district plans represented unconstitutional partisan gerrymanders. In April 2019, the court ruled that 34 congressional and state legislative districts had been subject to unconstitutional partisan gerrymandering. The court also found that 27 of the 34 challenged districts violated the plaintiffs' First and Fourteenth Amendment rights by diluting the impact of their votes. *League of Women Voters of Mich. v. Benson*, 373 F. Supp. 3d 867 (E.D. Mich. 2019) (three-judge court). The district court's

26.    On December 18, 2017, the ballot-question committee Voters Not Politicians ("VNP") filed an initiative petition with the Secretary of State that proposed amending the Michigan Constitution to establish a permanent Citizens Redistricting Commission in the legislative branch to redistrict Michigan's state legislative and congressional districts every ten years.[2] This Commission would replace the existing legislative process and eliminate any legislative oversight of the redistricting process.

27.    On June 20, 2018, the Michigan Board of State Canvassers certified that the initiative petition had a sufficient number of valid signatures and added it as "Michigan Ballot Proposal 18-2" to the November 6, 2018, general election ballot.[3]

---

ruling is currently being appealed by state officials.  On May 10, 2019, the state officials petitioned the Supreme Court for a stay of the lower court's ruling pending the appeal. *See* Congressional and State House Intervenors' Emergency Application for Stay, *Chatfield v. League of Women Voters of Mich.*, No. 18A1171 (U.S. filed May 10, 2019).  The Supreme Court granted the stay on May 24, 2019. *Id.*

[2] The    text    of    the    initiative    petition    is    available    at https://www.michigan.gov/documents/sos/Full_Text_-_VNP_635257_7.pdf.

[3] *See* Michigan Department of State, State of Michigan Statewide Ballot Proposals Status and Full    Text    November    6,    2018    General    Election    (2018), https://www.michigan.gov/documents/sos/Bal_Prop_Status_560960_7.pdf. Prior to the certification by the Board of State Canvassers, the Citizens Protecting Michigan's Constitution (CPMC) filed a complaint with the Michigan Court of Appeals seeking a writ of mandamus directing the Secretary of State and the Board to reject the VNP proposal because it wasn't appropriately considered a constitutional amendment that could be approved by petition. *Citizens Protecting Mich.'s Constitution v. Sec'y of State*, 324 Mich. App. 561 (Mich. Ct. App. 2018).  The Court of Appeals rejected plaintiffs' requested relief and ordered the Secretary of State and the Board to take all necessary measures to place the proposal on the general election ballot. *Id.*  The Michigan Supreme Court affirmed the Court of Appeals decision. Citizens *Protecting Mich.'s Constitution v. Sec'y of State*, 280 Mich. App. 273 (Mich. 2018).

28.   Ballot Proposal 18-2 stated:

*Statewide Ballot Proposal 18-2*

A proposed constitutional amendment to establish a commission of citizens with exclusive authority to adopt district boundaries for the Michigan Senate, Michigan House of Representatives and U.S. Congress, every 10 years

*This proposed constitutional amendment would:*

- Create a commission of 13 registered voters randomly selected by the Secretary of State:
  -4 each who self-identify as affiliated with the 2 major political parties; and
  -5 who self-identify as unaffiliated with major political parties.
- Prohibit partisan officeholders and candidates, their employees, certain relatives, and lobbyists from serving as commissioners.
- Establish new redistricting criteria including geographically compact and contiguous districts of equal population, reflecting Michigan's diverse population and communities of interest. Districts shall not provide disproportionate advantage to political parties or candidates.
- Require an appropriation of funds for commission operations and commissioner compensation.

Should this proposal be adopted?

[ ] YES

[ ] NO

Board of State Canvassers, *Official Ballot Wording approved by the Board of State Canvassers August 30, 2018 Voters Not Politicians* (2019), https://www.michigan.gov/documents/sos/Official_Ballot_Wording_Prop_

18-2_632052_7.pdf.

29.    Michigan voters passed the ballot proposal on November 6, 2018, and the Michigan Constitution was amended according to the revised language that accompanied the ballot proposal.

<u>Commissioner Application and Selection Process</u>

30.    The amended Michigan Constitution sets forth specific details of the Commission including the application process, eligibility criteria, and process for seeking and selecting commissioners.

31.    The Michigan Secretary of State is required to mail applications to at least 10,000 randomly selected registered voters encouraging them to apply. Mich. Const. art 4, § 6 (2)(A). The Secretary of State's office will randomly select 200 finalists from among the qualified applicants: 60 Republicans, 60 Democrats and 80 who are not affiliated with either major political party. *Id.* at § 6 (2)(D)(II). The selection process must be statistically weighted so that the pool of 200 finalists mirrors the geographic and demographic makeup of Michigan as closely as possible. *Id.* The majority and minority leaders in the Michigan House and Senate may reject up to five applicants each (20 total) before the final commission members are randomly selected from among the finalists. *Id.* at § 6 (2)(E). Applications to serve on the commission must be made available from January 1, 2020, through June 1, 2020. *Id.* at § 6 (2)(A), (C). Commissioners must be selected by September 1, 2020. *Id.* at § 6 (2)(F).

32.     A person must be registered and eligible to vote in Michigan to be eligible to serve on the Commission. *Id.* at § 6 (1)(A). Further, each Commissioner shall not currently be or in the past six years have been any of the following:

- A candidate or elected official of a partisan federal, state or local office;

- An officer or member of the leadership of a political party;

- A paid consultant or employee of an elected official, candidate or political action committee;

- An employee of the legislature;

- Registered as a lobbyist or an employee of a registered lobbyist;

- A political appointee who is not subject to civil service classification;

- Any parent, stepparent, child, stepchild or spouse of any individual that falls into one of the above categories.

*Id.* at § 6 (1)(B) and (C). In addition, ". . . for five years after the date of appointment, a commissioner [would be] ineligible to hold a partisan elective office at the state, county, city, village, or township level in Michigan." *Id.* at § 6 (1)(E).

33.     In July 2019, the Secretary of State released draft text of the application to serve as a commissioner on its website and invited the public to comment until August 9, 2019. App. A. The draft application asks a series of questions to ". . . make sure you're eligible and don't have any conflicts that would keep you from serving on the Citizens' Redistricting Commission." *Id.* The draft application explains that if the applicant answers "yes" to any one of the following statements, the applicant is ". . . not eligible

to serve on the commission . . . ":

        \*\*\*

    (2)    I am now, or have been at any time since August 15, 2014

        a. A declared candidate for a partisan election office in federal, state, or local[;]
        b. An elected official to partisan federal, state, or local office[;]
        c. An officer or member of the governing body of a political party, at the local, state, or national level[;]
        d. A paid consultant or employee of a federal, state, or local elected official or political candidate, campaign, or political action committee[;]
        e. An employee of the legislature[;]
        f. A lobbyist agent registered with the Michigan Bureau of Elections[;]
        g. An employee of a lobbyist registered with the Michigan Bureau of Elections[;]

    (3)    I am a parent, stepparent, child, stepchild, or spouse of a person to whom sections (a) through (g), above, would apply[;]

    (4)    I am disqualified for appointed or elected office in Michigan[.]

    \*\*\*

*Id.* The draft application also asks applicants to state whether they identify with the Democratic Party, the Republican Party, or neither party. *Id.* It also provides the applicant with the option of explaining his or her affiliation with the following question, ". . . [b]ecause Michigan voters do not register to vote by political party, if you would like to describe why – or how – you affiliate with either the Democratic Party, Republican Party, or neither, please do so below." *Id.*

    34.    The Secretary of State also released on its website, for public comment

until August 9, 2019, draft Commissioner Eligibility Guidelines. App. B. The draft guidelines provide clarification on the scope of the categories of individuals excluded from eligibility to serve on the commission. For example, the draft guidelines specify that a candidate for judge may be eligible to serve on the Commission because judicial officers are non-partisan. *Id.* Further, the guidelines state that volunteers of an elected official, political candidate, campaign, or political action committee may be eligible to serve on the Commission because volunteers are not paid for their services.  *Id.* In contrast, the eligibility guidelines state that any individual serving as a paid consultant or employee of a *non-partisan* elected official, non-partisan political candidate or *non-partisan* local political candidate's campaign since August 15, 2014, may not be eligible to serve on the Commission because the language of the exclusion is not explicitly limited to partisan offices. *Id.*

Functioning of Commission

35.    Each Commissioner holds office until the Commission has completed its obligations for the census cycle. Mich. Const. art 4, § 6 (18). Commissioners receive compensation equal to at least 25 percent of the governor's salary and the State will reimburse Commissioners for costs incurred if the legislature does not appropriate sufficient funds to cover these costs. *Id.* at § 6 (5).

36.    The Secretary of State serves as Secretary of the Commission. Though she has no vote, she has a significant role in administering the Commission, including

furnishing the Commission with all technical services that the Commission deems necessary. *Id.* at § 6 (4).

37.     The affirmative votes of at least seven members, including a minimum of two Democrats, two Republicans, and two members not affiliated with the major parties, are needed to pass a redistricting plan. *Id.* at § 6 (14)(C). Commissioners are required to prioritize specific criteria when developing redistricting plans, including compliance with federal laws; equal population sizes; geographic contiguousness; demographics and communities of similar historical, cultural, or economic interests; no advantages to political parties; no advantages to incumbents; municipal boundaries; and compactness. *Id.* at § 6 (13).

<u>Unconstitutional Conditions on Eligibility to Serve on the Commission</u>

38.     "For at least a quarter-century, this Court has made clear that, even though a person has no 'right' to a valuable governmental benefit, and even though the government may deny him the benefit for any number of reasons, *there are some reasons upon which the government may not act. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech.* For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' Such interference with constitutional rights is impermissible." *Rutan*

*v. Repub. Party*, 497 U.S. 62, 86, (1990) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (emphasis in original)  and *Speiser v. Randall,* 357 U.S. 513, 526 (1957) (alteration in original)).

39.     In applying these principles, the Supreme Court has recognized that government positions, such as commissioner, convey a valuable government benefit. The most obvious of these benefits are specific quantifiable economic benefits. In this case, each Commissioner receives monetary compensation from the State ". . . at least equal to 25 percent of the governor's salary", which was reportedly $159,300 as of January 2018.[4] Mich. Const. art 4, § 6 (5). Thus, a Commissioner receives at least $39,825 in monetary compensation. Further, courts have recognized that quantifiable economic worth is not the only valuable benefit derived from a government position. In considering whether membership on a government advisory committee denied the excluded applicant any benefit, ". . . the D.C. Circuit recognized that a benefit need only have value to those who seek it[]" and ". . . because the . . . membership did have value to plaintiffs, withholding this benefit could pressure plaintiffs into forgoing the exercise of their constitutional rights." *Autor v. Blank*, 128 F. Supp.3d 331, 334 (D.D.C. 2015), (citing *Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014). Thus, Plaintiffs— who each desire to serve on the Commission but are excluded from consideration—

---

[4] *See* Abigail Hess, *The 5 states with the highest and lowest paid politicians*, (Jan. 25, 2018, 10:47 AM), https://www.cnbc.com/2018/01/25/the-5-states-with-the-highest-and-lowest-paid-politicians.html.

have been denied a benefit.

40.     Further, Plaintiffs have been excluded from eligibility based on their exercise of one or more of their constitutionally protected interests, *i.e.*, freedom of speech (*e.g.*, by the exclusion of candidates for partisan office), right of association (*e.g.*, by the exclusion of members of a governing body of a political party), and/or the right to petition (*e.g.*, by the exclusion of registered lobbyists).

41.     Each of these rights is well established. For instance, the Supreme Court has made clear that lobbying is a quintessential example of the exercise of the right to petition that is protected by the First Amendment. "In a representative democracy . . . [the] government act[s] on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 137 (1961).

42.     The Supreme Court has also previously held that "[t]he First Amendment protects political association as well as political expression," and that "[t]he right to associate with the political party of one's choice is an integral part of this basic constitutional freedom" of association. *Elrod*, 427 U.S. at 357 (plurality opinion) (quoting *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973) (citing *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)).

43.     ". . . [P]olitical belief and association constitute the core of those activities

protected by the First Amendment. Regardless of the nature of the inducement, whether it be by the denial of public employment or, as in *Board of Education v. Barnette,* 319 U. S. 624 (1943), by the influence of a teacher over students, '[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.' And, . . . '[t]here can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of "orderly group activity" protected by the First and Fourteenth Amendments. The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom.' These protections reflect our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' a principle itself reflective of the fundamental understanding that '[c]ompetition in ideas and governmental policies is at the core of our electoral process[.]'" *Elrod*, 427 U.S. at 355-58 (internal citations omitted) (some alterations in original).

44.      Conditions of employment that compel or restrain belief and association (*e.g.*, patronage requirements or exclusionary factors based on a person's status within a political party) are inimical to the process which undergirds our system of government and is ". . . at war with the deeper traditions of democracy embodied in the First Amendment." *Illinois State Employees Union v. Lewis,* 473 F.2d 561, 576 (7th Cir. 1972).

The Supreme Court has made clear that, "[u]nder [its] sustained precedent, conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so." *Rutan,* 497 U.S. at 78. ". . . [T]he government must demonstrate (1) a vital government interest that would be furthered by its political hiring practices; and (2) that the patronage practices are narrowly tailored to achieve that government interest."[5] *Vickery,* 856 F. Supp. at 1322.

45.    In this case, VNP stated that the relevant government interest was to create a "a fair, impartial, and transparent process where voters - not politicians - will draw Michigan's state Senate, state House, and Congressional election district maps."[6] With regard to the exclusion of the eight categories of individuals from eligibility to serve, VPN explained that "[t]he amendment disqualifies these individuals from

---

[5]  Some courts have applied a strict-scrutiny standard in assessing the constitutionality of laws that burden the right to petition, requiring the government to demonstrate that the challenged law is justified by a "compelling government interest" and that it uses the "least restrictive means" of furthering that interest. *See, e.g., ACLU v. New Jersey Election Law Enforcement Comm.*, 509 F. Supp. 1123, 1129 (D.N.J. 1981). This is a more demanding standard than intermediate scrutiny, which inquires whether the challenged law is "narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence,* 468 U.S. 288, 293 (1984)). The narrow tailoring element of the intermediate scrutiny test requires that the government's chosen means not be "substantially broader than necessary to achieve the government's interest." *Ward,* 491 U.S. at 800.

[6]  *We Ended Gerrymandering in Michigan*, Voters Not Politicians,
    https://votersnotpoliticians.com/redistricting/.

serving on the Commission because they are *most likely* to have a conflict of interest when it comes to drawing Michigan's election district maps."[7]

46.     In excluding certain categories of citizens from eligibility based on their exercise of core First Amendment rights, including freedom of speech, right of association, and right to petition the government, the State has unconstitutionally conditioned eligibility for a valuable benefit on their willingness to limit their First Amendment right to petition government. *See Adams v. Governor of Delaware*, No. 18-1045 (3d Cir. 2019) (Plaintiff's freedom of association rights were violated by a political balance requirement that prevented his application to Delaware's Supreme Court, Superior Court, and Chancery Court); *Autor*, 740 F.3d at 179.

47.     The exclusionary factors also violate the Equal Protection Clause because they burden only individuals that fall into set categories that may indicate partisan bias, while imposing no restriction on individuals who may be just as partisan, or more partisan. Thus, the government interest is not a sufficient fit with the restrictions to justify the distinction the challenged provision draws between Plaintiffs and all other eligible registered voters.

---

[7] *Id.* (emphasis added).

**Unconstitutional Portions of the Redistricting Commission are Not Severable**

48.     The Michigan legislature has enacted a general severability statute with respect to legislation that instructs: "If any portion of an act . . . shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable." Mich. Comp. Laws § 8.5.

49.     The Michigan Supreme Court has affirmed this standard, focusing on whether severing a particular provision is not ". . . inconsistent with the manifest intent of the legislature[.]" *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38,* 806 N.W.2d 683 (Mich. 2011) (quoting Mich. Comp. Laws § 8.5) (citing *Eastwood Park Amusement Co. v. East Detroit Mayor*, 38 N.W.2d 77, 81 (1949)). Relevant factors in making this determination include indications that the legislature intended a different severability rule to apply, the remedy requested by the Attorney General, and evidence that the legislature would have adopted the statute even with the knowledge that provisions could be severed. 806 N.W.2d at 713. The Sixth Circuit has explained, in applying Michigan's general severability statute, that ". . . the law remaining after an invalid portion of the law is severed will be enforced independently 'unless the invalid provisions are deemed so essential, and are so interwoven with others, that it cannot be presumed that the legislature intended the statute to operate otherwise than as a

whole.'" *Garcia v. Wyeth-Ayerst Labs*, 385 F.3d 961, 967 (6th Cir. 2004) (quoting *Moore v. Fowinkle*, 512 F.2d 629, 632 (6th Cir. 1975)).

50.   Applying these standards to a constitutional amendment approved by voters through a ballot initiative presents some challenges because none of the information is used to determine intent. While courts can look to the legislative record in interpreting statutes, there is no comparable record of amendments or debate for a successful ballot initiative beyond the binary vote on election day. Thus, if a portion of a ballot initiative is declared unlawful it can be difficult to determine whether the electorate would have enacted the ballot measure without the invalid provision.

51.   In *In re Apportionment of State Legislature-1982*, 321 N.W.2d 565 (Mich. 1982), the Michigan Supreme Court had to decide whether Michigan's redistricting commission could function under a set of standards different from those initially adopted at a state constitutional convention (since the first standards were deemed unconstitutional by the United States Supreme Court in *Marshall v. Hare*, 378 U.S. 561 (1964)). The court ruled against severability, holding that the commission was inseparable from the unconstitutional standards because holding otherwise would have required the court to opine on whether the people would have voted for the commission without the standards subsequently found to be unconstitutional. The court reached this conclusion, in part, because the majority believed that such a decision properly belonged to the people of Michigan and *not* to the court. *Id.* at 582. As the

court noted, no one "... can ... predict what the voters would do if presented with the severability question at a general election .... The people may prefer to have the matter returned to the political process or they may prefer plans drawn pursuant to the guidelines which are delineated in this opinion." *Id.*

52.     In *Lucas v. Forty-Fourth General Assembly*, 377 U.S. 713 (1964), Colorado voters approved an amendment to their state constitution that reapportioned state senate districts on a basis which the Supreme Court subsequently deemed unconstitutional. *Id.* at 717. The Court, ruling on the question of severability, struck down the entire amendment—including the constitutionally permissible population-based apportionment of the state house—because "... there is no indication that the apportionment of the two houses of the Colorado General Assembly ... is severable." *Id.* at 735.

53.     Similarly, in *Randall v. Sorrell*, 548 U.S. 230 (2006), the Supreme Court struck down an entire Vermont campaign finance statute after determining that the law's contribution limits violated the First Amendment because the majority determined that severing the unconstitutional provisions "... would [have] require[d] us to write words into the statute ... or to foresee which of many different possible ways the legislature might respond to the constitutional objections we have found." *Id* at 262.

54.     But the fundamental question in any severability inquiry, no matter the

form of the enactment at issue, is intent. In *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999), the Supreme Court assumed for the purpose of the decision that statutory severability standards applied to the constitutional analysis of executive orders. The Court, in ruling against severability, affirmed that a severability inquiry "is essentially an inquiry into legislative intent," and proceeded to analyze the executive order by assessing the President's intentions in signing it. *Id.* at 191 (citing *Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984) (plurality op.).

55.     The vast quantity of people participating in the vote for a ballot initiative makes an inquiry into popular intent *more* difficult than an inquiry into legislative or executive intent, and that scarcity of evidence should encourage judicial modesty. Here, however, the official ballot wording for Proposal 18-2 specifically states that the proposed amendment would "[p]rohibit partisan officeholders and candidates, their employees, certain relatives, and lobbyists from serving as commissioners." Michigan Board of State Canvassers, *Official Ballot Wording approved by the Board of State Canvassers August 30, 2018 Voters Not Politicians* (2019), https://www.michigan.gov/documents/sos/Official_Ballot_Wording_Prop_18-2_632052_7.pdf.

56.     Further, the language of the accompanying draft amendments provided with the ballot proposal, provided specific details of the exact categories of individuals that would be ineligible to serve on the Commission. Voters Not Politicians, *Official Full*

*Text for Proposal 18-2 Initiative Petition Amendment to the Constitution*, https://www.michigan.gov/documents/sos/Full_Text_-_VNP_635257_7.pdf. This supports the conclusion that the voters, when they supported the ballot proposal, believed that such restrictions were a vital part of the overall proposal, and thus not severable. To the extent that there is not enough information to draw conclusions about voter intent, under the precedent and the circumstances presented here, it is similarly not appropriate to sever those unconstitutional aspects of the amendment from the remaining provisions regarding the Commission.

## FIRST CAUSE OF ACTION
### (Violation of the First Amendment)

57. Paragraphs 1 through 56 are fully incorporated herein.

58. Plaintiffs have a First Amendment right to associate freely with each other, to participate in the political process, to express their political views, and to petition the government for a redress of grievances, without discrimination by the State based on their exercise of these rights.

59. The exclusion of eight categories of Michigan citizens, as set forth above, from eligibility to serve on the Commission substantially burdens First Amendment rights by denying the benefit of state employment to individuals whose exercise of those rights triggers one of the eight excluded categories.

60.     These exclusions are not justified by the stated interests of implementing a ". . . fair, impartial, and transparent redistricting process", *See supra* n. 6, because excluding Plaintiffs from the Commission cannot be adequately linked to the achievement of those goals. While other aspects of the Commission can logically be connected to those goals (*e.g.*, public meetings, publishing of each redistricting proposal, prohibition on *ex parte* communications with commissioners, prohibition on the acceptance of gifts by the commissioners, requirement of a majority vote for substantive determinations), excluding Plaintiffs from serving on the Commission cannot convincingly be so connected.

61.     VNP explains that Plaintiffs are banned from serving on the Commission because they are the "most likely" to have a conflict of interest in the redistricting process. *Id.* This assumption, which appears to be an attempt to get to the core of impartiality, erroneously assumes that it is only elected officials and candidates, and those somehow tied to them, have a personal and passionate interest in the outcome of redistricting. Further, there are no mechanisms to identify and eliminate from consideration applicants who are extremely partisan in nature but do not fall into one of the banned categories. The Commission's application process provides a system of self-identified "affiliation" (or lack of affiliation) yet provides no definition of "affiliation" and no clear mechanism for the state to determine if an individual has accurately designated his or her affiliation or to recategorize such

designation if it is somehow found to be inaccurate. As a result, there is no assurance that an applicant has appropriately declared his or her true political biases, allowing for unchecked manipulation of the system and thus undermining the stated goals of transparency and impartiality. The result is a stark and inappropriate disparity in treatment between the Plaintiffs and the vast numbers of citizens who are equally invested personally in the outcome of the redistricting process but remain eligible to serve as a commissioner.

62.     Further, it is inappropriate to single out Plaintiffs based on perceived impartiality because the Commission itself is not designed to be impartial. Rather, it is designed to be an amalgam of a variety of views across the political spectrum. That prohibiting Plaintiffs' participation is somehow constitutionally justified because it would undermine the "impartiality" of a Commission that necessarily includes a variety of views, including self-declared partisan ones, is unsupportable. There is no compelling explanation as to how Plaintiffs' participation would result in a Commission with less impartiality than a Commission that includes individuals who hold political views that are just as strong, or even stronger, but do not happen to belong to one of the excluded groups.

63.     Thus, the Government has no legitimate basis on which to condition Plaintiffs' eligibility to serve on the Commission on their agreement to forgo

constitutionally protected activities. This categorical exclusion of Plaintiffs from serving on the Commission attaches an unconstitutional condition on eligibility because the State may not deny a benefit to a person on a basis that infringes his or her constitutionally protected rights.

64.     Accordingly, the Plaintiffs are deprived of their civil rights under color of state law in violation of 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION

### (Violation of Equal Protection)

65.     Paragraphs 1 through 64 are fully incorporated herein.

66.     The Fourteenth Amendment's Due Process Clause prevents the State from discriminating against individuals engaged in constitutionally protected activity unless justified by a sufficiently important government interest.

67.     The provisions of the Michigan Constitution that exclude categories of individuals from eligibility for service on the Commission denies Plaintiffs a benefit available to others on account of their exercise of fundamental rights that are expressly protected by the First Amendment.

68.     As the Supreme Court stated in *Police Dep 't of Chicago v. Mosley,* ". . . [t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." 408 U.S. 92, 101 (1972). Here, this standard is not met.  For example, the restriction draws an unconstitutional distinction

between those who exercise their rights of association and rights to petition the government and those who do not. These exclusions penalize some individuals who engage in lobbying but impose no sanction at all on other individuals whose lobbying activities are much more extensive than those subject to the policy, including those who structure their time so as not to cross the registration thresholds. Further, the Secretary of State has explained in draft guidance that while paid employees of an elected official, political candidate, campaign, or political action committee are excluded from eligibility, volunteers may be eligible to serve on the Commission because they are not paid for their services. *See* App. B.  And, those same guidelines state that any individual serving as a paid consultant or employee of a *non-partisan* elected official, non-partisan political candidate or *non-partisan* local political candidate's campaign since August 15, 2014, may not be eligible to serve on the Commission. *Id.* Similarly, although Supreme Court Justices in Michigan are nominated by political parties in an inherently partisan process, they are not excluded from eligibility to serve on the Commission. *Id.* These are but a few examples of the constitutional shortcomings of the exclusionary categories included in the constitutional amendments that created and control the Commission.

69.    Further, as described above, the classifications on which these exclusions are based are not meaningfully tied to apparent State interests in promoting transparency, fairness, or impartiality in the redistricting process.

70.    For all these reasons, the Plaintiffs have been and will continue to

be deprived unconstitutionally of the equal protection of the law.

71.    Accordingly, the Plaintiffs are deprived of their civil rights under color of state law in violation of 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)    Declare Michigan's Independent Citizens Redistricting Commission for State Legislative and Congressional Districts unconstitutional and invalid and the administration of the selection of commissioners a violation of Plaintiffs' constitutional rights;

(2)    Enjoin Defendant and her employees and agents from administering or preparing for the selection of commissioners to serve on the commission;

(3)    Award Plaintiffs their costs and reasonable attorneys' fees, and litigation expenses incurred in bringing this action; and

(4)    Grant further relief as this Court deems just and proper.

July 30, 2019                                Respectfully submitted,


/s/ Jason Torchinsky                         /s/ John J. Bursch
Jason Torchinsky                             John J. Bursch
Counsel of Record                            BURSCH LAW PLLC
Holtzman Vogel Josefiak Torchinsky PLLC      9339 Cherry Valley Ave. SE, #78
45 North Hill Drive, S 100                   Caledonia, Michigan 49316
Warrenton, Virginia 20106                    (616) 450-4235
(540) 341-8800                               jbursch@burschlaw.com
JTorchinsky@hvjt.law

/s/ *Eric E. Doster*
Eric E. Doster (P41782)
DOSTER LAW OFFICES, PLLC
2145 Commons Parkway
Okemos, MI 48864
(517) 977-0147
eric@ericdoster.com

Attorney for Plaintiffs