ANTHONY DAUNT, et al.,

       Plaintiffs,

v.

JOCELYN BENSON, et al.,

       Defendants.

_____

Case No. 1:19-cv-614
(Lead)

MICHIGAN REPUBLICAN PARTY, et al.,

       Plaintiffs,

v.

JOCELYN BENSON, et al.,

       Defendants.

_____/

Case No. 1:19-cv-669
(Member)

HON. JANET T. NEFF

## OPINION

I.  BACKGROUND
  A.  Factual Background
  B.  Procedural Posture
        1.  The Lead Case
        2.  The Member Case
II.  ANALYSIS
  A.  Motion Standard
  B.  Threshold Questions
        1.  Standing
        2.  Laches
  C.  The Lead Case
        1.  Likelihood of Success on the Merits
          a.  First Amendment (Count I)
          b.  Equal Protection (Count II)
        2.  Irreparable Injury
        3.  Substantial Injury & Public Interest
  D.  The Member Case
        1.  Likelihood of Success on the Merits
          a.  Freedom of Association (Count I)
          b.  Freedom of Association (Count II)
          c.  Freedom of Speech—Viewpoint Discrimination (Count III)
          d.  Freedom of Speech—Restricted Speech (Count IV)
          e.  Equal Protection (Count V)
        2.  Irreparable Injury
        3.  Substantial Injury & Public Interest
III.  CONCLUSION

These consolidated cases involve federal constitutional claims brought under 42 U.S.C. § 1983 against Michigan Secretary of State Jocelyn Benson regarding the creation and administration of Michigan's Independent Citizens Redistricting Commission for State Legislative and Congressional Districts ("the Commission"). Plaintiffs in the Lead Case, which was filed in July 2019, are fifteen individuals who are allegedly excluded from serving on the Commission. Plaintiffs in the Member Case, which was filed in August 2019, are the Michigan Republican Party (MRP) and MRP's current chair, members, affiliates and/or relatives, who are also allegedly excluded from serving on the Commission. This Court permitted "Count MI Vote" d/b/a "Voters Not Politicians" (hereinafter VNP) to intervene as a Defendant in both actions. Plaintiffs in both

cases accompanied their Complaints with a motion for a preliminary injunction. Defendants oppose any injunctive relief and have filed motions to dismiss both cases. All of the motions were fully briefed last month, and the Court now turns to the requests for preliminary injunctive relief. Having considered the parties' submissions, the Court concludes that oral argument is not necessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court denies the motions for a preliminary injunction in both cases.

## I. BACKGROUND

### A. Factual Background

The pertinent facts are primarily drawn from the content of the constitutional language, which is the factual background common to both cases. The parties agree that the propriety of preliminary injunctive relief turns on questions of law, not any contested facts.

Every ten years following the decennial United States Census, Michigan adjusts its state legislative and congressional district boundaries based on the population changes reflected in the census (Compl. ¶ 25, ECF No. 1 at PageID.8).[1] Until November 2018, the Michigan Legislature redrew the congressional and state legislative district boundaries (*id.*). Redistricting plans were adopted if approved by a simple majority vote in both chambers of the state legislature and subsequently signed by the Governor (*id.*). The state legislature last approved new congressional district boundaries on June 29, 2011, and the governor signed them into law on August 9, 2011 (*id.*). The 2011 redistricting plan was the subject of ongoing litigation (*id.* n.1).

On December 18, 2017, VNP filed an initiative petition with the Secretary of State that proposed amending the Michigan Constitution to establish a permanent Citizens Redistricting

---

[1] Consistent with the Court's consolidation order (ECF No. 30), docket references are to entries in the Lead Case, unless otherwise noted.

Commission in the legislative branch to redistrict Michigan's state legislative and congressional districts every ten years (Compl. ¶ 26, ECF No. 1 at PageID.10). The Commission would replace the existing legislative process and eliminate any legislative oversight of the redistricting process (*id.*).

As the Michigan Court of Appeals explained in its June 7, 2018 Opinion approving submission of VNP's proposal to the voters, VNP offered the proposed constitutional amendment "to remedy the widely-perceived abuses associated with partisan 'gerrymandering' of state legislative and congressional election districts by the establishment of new constitutionally mandated procedures designed to ensure that the redistricting process can no longer be dominated by one political party." *Citizens Protecting Michigan's Constitution v. Sec'y of State*, 922 N.W.2d 404, 410 (Mich. Ct. App. 2018), aff'd, 921 N.W.2d 247 (Mich. 2018).

On June 20, 2018, the Michigan Board of State Canvassers certified that the initiative petition had a sufficient number of valid signatures and added it as "Michigan Ballot Proposal 18-2" to the November 6, 2018 general election ballot (Compl. ¶ 27, ECF No. 1 at PageID.10). Ballot Proposal 18-2 provided the following:

*Statewide Ballot Proposal 18-2*

A proposed constitutional amendment to establish a commission of citizens with exclusive authority to adopt district boundaries for the Michigan Senate, Michigan House of Representatives and U.S. Congress, every 10 years.

*This proposed constitutional amendment would:*

- Create a commission of 13 registered voters randomly selected by the Secretary of State:

  - 4 each who self-identify as affiliated with the 2 major political parties; and

  - 5 who self-identify as unaffiliated with major political parties.

- Prohibit partisan officeholders and candidates, their employees, certain relatives, and lobbyists from serving as commissioners.

- Establish new redistricting criteria including geographically compact and contiguous districts of equal population, reflecting Michigan's diverse population and communities of interest. Districts shall not provide disproportionate advantage to political parties or candidates.

- Require an appropriation of funds for commission operations and commissioner compensation.

Should this proposal be adopted?

[ ] YES
[ ] NO

*Id.* ¶ 28. Michigan voters passed the ballot proposal on November 6, 2018, and the Michigan Constitution was amended according to the revised language that accompanied the ballot proposal (*id.* ¶ 29). The amendment became effective on December 22, 2018. *See* MICH. CONST. 1963, Art. XII, § 2.

Articles IV through VI of the amended Michigan Constitution set forth specific details of the Commission including the application process, eligibility criteria, and process for seeking and selecting commissioners (Compl. ¶ 27, ECF No. 1 at PageID.10). Article IV pertains to the legislative branch, whereas Articles V and VI pertain to the executive and judicial branches. The eligibility criteria are found in Article IV, § 6 (1) of the Michigan Constitution, as amended, as follows:

(1) An independent citizens redistricting commission for state legislative and congressional districts (hereinafter, the "commission") is hereby established as a permanent commission in the legislative branch. The commission shall consist of 13 commissioners. The commission shall adopt a redistricting plan for each of the following types of districts: state senate districts, state house of representative districts, and congressional districts. Each commissioner shall:

(a) Be registered and eligible to vote in the state of Michigan;

(b) Not currently be or in the past 6 years have been any of the following:

(i)      A declared candidate for partisan federal, state, or local office;

(ii)     An elected official to partisan federal, state, or local office;

(iii)    An officer or member of the governing body of a national, state, or local political party;

(iv)    A paid consultant or employee of a federal, state, or local elected official or political candidate, of a federal, state, or local political candidate's campaign, or of a political action committee;

(v)     An employee of the legislature;

(vi)    Any person who is registered as a lobbyist agent with the Michigan bureau of elections, or any employee of such person; or

(vii)   An unclassified state employee who is exempt from classification in state civil service pursuant to article XI, section 5, except for employees of courts of record, employees of the state institutions of higher education, and persons in the armed forces of the state;

(c) Not be a parent, stepparent, child, stepchild, or spouse of any individual disqualified under part (1)(b) of this section; or

(d) Not be otherwise disqualified for appointed or elected office by this constitution.

(e) For five years after the date of appointment, a commissioner is ineligible to hold a partisan elective office at the state, county, city, village, or township level in Michigan.

MICH. CONST. Art. IV, § 6 (1).

As Secretary of State, Defendant Benson is the "chief election officer of the state" and is responsible for overseeing the conduct of elections. MICH. COMP. LAWS § 168.21. Subsection (2) of § 6 instructs Secretary Benson in the selection of commissioners, as follows:

(a) The secretary of state shall do all of the following:

(i)      Make applications for commissioner available to the general public not later than January 1 of the year of the federal decennial census. The secretary of state shall circulate the applications in a manner that invites wide public participation from different regions of the state. The secretary of state shall also mail applications for commissioner to ten thousand Michigan registered voters, selected at random, by January 1 of the year of the federal decennial census.

    (ii)      Require applicants to provide a completed application.

    (iii)    Require applicants to attest under oath that they meet the qualifications set forth in this section; and either that they affiliate with one of the two political parties with the largest representation in the legislature (hereinafter, "major parties"), and if so, identify the party with which they affiliate, or that they do not affiliate with either of the major parties.

(b) Subject to part (2)(c) of this section, the secretary of state shall mail additional applications for commissioner to Michigan registered voters selected at random until 30 qualifying applicants that affiliate with one of the two major parties have submitted applications, 30 qualifying applicants that identify that they affiliate with the other of the two major parties have submitted applications, and 40 qualifying applicants that identify that they do not affiliate with either of the two major parties have submitted applications, each in response to the mailings.

(c) The secretary of state shall accept applications for commissioner until June 1 of the year of the federal decennial census.

(d) By July 1 of the year of the federal decennial census, from all of the applications submitted, the secretary of state shall:

    (i)       Eliminate incomplete applications and applications of applicants who do not meet the qualifications in parts (1)(a) through (1)(d) of this section based solely on the information contained in the applications;

    (ii)      Randomly select 60 applicants from each pool of affiliating applicants and 80 applicants from the pool of non-affiliating applicants. 50% of each pool shall be populated from the qualifying applicants to such pool who returned an application mailed pursuant to part 2(a) or 2(b) of this section, provided, that if fewer than 30 qualifying applicants affiliated with a major party or fewer than 40 qualifying non-affiliating applicants have applied to serve on the commission in response to the random mailing, the balance of the pool shall be populated from the balance of qualifying applicants to that pool. The random selection process used by the secretary of state to fill the selection pools shall use accepted statistical weighting methods to ensure that the pools, as closely as possible, mirror the geographic and demographic makeup of the state; and

    (iii)    Submit the randomly-selected applications to the majority leader and the minority leader of the senate, and the speaker of the house of representatives and the minority leader of the house of representatives.

(e) By August 1 of the year of the federal decennial census, the majority leader of the senate, the minority leader of the senate, the speaker of the house of representatives, and the minority leader of the house of representatives may each strike five applicants

from any pool or pools, up to a maximum of 20 total strikes by the four legislative leaders.

(f) By September 1 of the year of the federal decennial census, the secretary of state shall randomly draw the names of four commissioners from each of the two pools of remaining applicants affiliating with a major party, and five commissioners from the pool of remaining non-affiliating applicants.

MICH. CONST. Art. IV, § 6 (2).

In June 2019, the United States Supreme Court, in holding that partisan gerrymandering is non-justiciable, pointed to the establishment of independent redistricting commissions as a way that states are "restricting partisan considerations in districting through legislation," specifically referencing Michigan's 2018 adoption of Article 4, § 6. *Rucho v. Common Cause*, ___ U.S. ___, ___; 139 S. Ct. 2484, 2507 (2019).

In July 2019, Secretary Benson released draft text of the application to serve as a commissioner on its website and invited the public to comment until August 9, 2019 (Compl. ¶ 33, ECF No. 1 at PageID.13). The draft application asks a series of questions to ". . . make sure you're eligible and don't have any conflicts that would keep you from serving on the Citizens' Redistricting Commission" (*id.*, quoting App. A). The draft application explains that if the applicant answers "yes" to any one of the following statements, then the applicant is ". . . not eligible to serve on the commission . . . ":

(2)    I am now, or have been at any time since August 15, 2014

a.    A declared candidate for a partisan election office in federal, state, or local[;]

b.    An elected official to partisan federal, state, or local office[;]

c.    An officer or member of the governing body of a political party, at the local, state, or national level[;]

d.    A paid consultant or employee of a federal, state, or local elected official or political candidate, campaign, or political action committee[;]

8

      e.        An employee of the legislature[;]

      f.         A lobbyist agent registered with the Michigan Bureau of Elections[;]

      g.        An employee of a lobbyist registered with the Michigan Bureau of Elections[;]

(3)      I am a parent, stepparent, child, stepchild, or spouse of a person to whom sections (a) through (g), above, would apply[;]

(4)      I am disqualified for appointed or elected office in Michigan[.]

*Id.* The draft application also asks applicants to state whether they identify with the Democratic Party, the Republican Party, or neither party (*id.*). It also provides the applicant with the option of explaining his or her affiliation with the following question, ". . . [b]ecause Michigan voters do not register to vote by political party, if you would like to describe why—or how—you affiliate with either the Democratic Party, Republican Party, or neither, please do so below" (*id.*).

The Secretary of State also released on its website, for public comment until August 9, 2019, draft Commissioner Eligibility Guidelines (Compl. ¶ 34, ECF No. 1 at PageID.14-15, citing App. B). The draft guidelines provide clarification on the scope of the categories of individuals excluded from eligibility to serve on the Commission (*id.* at PageID.15). For example, the draft guidelines specify that a candidate for judge may be eligible to serve on the Commission because judicial officers are non-partisan (*id.*). Further, the guidelines state that volunteers of an elected official, political candidate, campaign, or political action committee may be eligible to serve on the Commission because volunteers are not paid for their services (*id.*). In contrast, the eligibility guidelines state that any individual serving as a paid consultant or employee of a non-partisan elected official, non-partisan political candidate or nonpartisan local political candidate's campaign since August 15, 2014, may not be eligible to serve on the Commission because the language of the exclusion is not explicitly limited to partisan offices (*id.*).

Each commissioner holds office until the Commission has completed its obligations for the census cycle. MICH. CONST. Art. IV, § 6 (18). Commissioners receive compensation at least equal to 25 percent of the governor's salary, and the State will reimburse commissioners for costs incurred if the legislature does not appropriate sufficient funds to cover these costs. § 6 (5). "[M]embers of . . . commissions" do not hold "classified state civil service" positions. MICH. CONST. Art. XI, § 5.

The Secretary of State serves as Secretary of the Commission and, in that capacity, furnishes, under the direction of the Commission, "all technical services that the commission deems necessary." MICH. CONST. Art. IV, § 6 (4). The Secretary of State is a non-voting member of the Commission. *Id.*

The affirmative votes of at least seven members, including a minimum of two Democrats, two Republicans, and two members not affiliated with the major parties, are needed to pass a redistricting plan. MICH. CONST. Art. IV, § 6 (14)(C). Commissioners are required to prioritize specific criteria when developing redistricting plans, including compliance with federal laws; equal population sizes; geographic contiguousness; demographics and communities of similar historical, cultural, or economic interests; no advantages to political parties; no advantages to incumbents; municipal boundaries; and compactness. § 6 (13).

The new Article IV, § 6 (11) also includes an open-meeting requirement, which instructs that

> [t]he commission, its members, staff, attorneys, and consultants shall not discuss redistricting matters with members of the public outside of an open meeting of the commission, except that a commissioner may communicate about redistricting matters with members of the public to gain information relevant to the performance of his or her duties if such communication occurs (a) in writing or (b) at a previously publicly noticed forum or town hall open to the general public.

MICH. CONST. Art. IV, § 6 (11).

Last, the newly amended Article IV, § 6 includes a severability clause that prescribes severance of any provision found to be in conflict with the United States Constitution or federal law, and directs that the provisions of that section be implemented to the maximum extent allowable under the Constitution and federal law:

> (20) This section is self-executing. If a final court decision holds any part or parts of this section to be in conflict with the United States constitution or federal law, the section shall be implemented to the maximum extent that the United States constitution and federal law permit. Any provision held invalid is severable from the remaining portions of this section.

MICH. CONST. Art. IV, § 6 (20).

## B. Procedural Posture

### 1. The Lead Case

On July 30, 2019, nearly nine months after the passage of Proposal 18-2, fifteen Plaintiffs filed this Lead Case against Secretary Benson, in her official capacity (Compl. ¶ 22, ECF No. 1 at PageID.8). The Lead Plaintiffs allege two counts: Violation of the First Amendment (Count I) and Violation of Equal Protection (Count II). Their claims concern the make-up of the Commission. Plaintiffs allege that they are individuals affiliated with the Republican Party who are "excluded from serving on the Commission because they fall into one or more of [the] eight categories" described above (*id.* ¶ 2). Specifically, Plaintiffs make the following allegations relevant to the eight categories:

*"Declared candidate for partisan federal, state, or local office,"* MICH. CONST. Art. IV, § 6 (1)(b)(i). Plaintiff Aaron Beauchine became a declared Republican candidate for Ingham County Commissioner, a local partisan office, on March 15, 2018 (Compl. ¶ 9, ECF 1 at PageID.5).

*"Elected official to partisan federal, state, or local office,"* MICH. CONST. Art. IV, § 6 (1)(b)(ii). Plaintiff Tom Barrett became a declared candidate for partisan state office on September 13, 2017 and was elected as a Republican to the Michigan Senate in November 2018 (Compl. ¶ 8,

ECF 1 at PageID.5). His term of office began January 1, 2019 (*id.*). Several Plaintiffs— Linda Tarver, Mary Shinkle, Norm Shinkle and Clint Tarver—also serve as elected Republican precinct delegates (*id.* ¶¶ 14, 17, 18 & 21).

"*Officer or member of the governing body of a national, state, or local political party,*" MICH. CONST. Art. IV, § 6 (1)(b)(iii). Plaintiff Anthony Daunt has served as an officer and member of the governing body of the Clinton County Republican Party since 2017 (Compl. ¶ 7, ECF 1 at PageID.5). Since April 2017, Plaintiff Anthony Daunt has also served as a member of the governing body of the Michigan Republican Party Committee (*id.*). Plaintiff Kathy Berden has served as the national committeewoman of the Republican Party since 2016 (*id.* ¶ 10). Plaintiff Gerry Hildenbrand has been a member of a governing body of a national, state, or local political party since 2017 (*id.* ¶ 12). Plaintiff Linda Tarver serves as President of the Republican Women's Federation of Michigan, which is a voting member of the Michigan Republican Party's State Central Committee (*id.* ¶ 14). Plaintiff Marian Sheridan has been a member of a governing body of a state political party since February 2019, specifically the Grassroots Vice Chair of the Michigan Republican Party (*id.* ¶¶ 16 & 19). Plaintiff Mary Shinkle has served as the Vice Chair of the Ingham County Republican Party, a local political party, since November 2018 (*id.* ¶ 17). And Plaintiff Norm Shinkle has been an officer or member of a governing body of a state political party since February 2017 (*id.* ¶ 18).

"*A paid consultant or employee of a federal, state, or local elected official or political candidate, of a federal state, or local political candidate's campaign, or of a political action committee,*" MICH. CONST. Art. IV, § 6 (1)(b)(iv). Plaintiff Gary Koutsoubos has been a consultant to a candidate(s) for a federal, state, or local office or a political action committee since July 8, 2017 (Compl. ¶ 13, ECF 1 at PageID.6). Plaintiff Patrick Meyers has been a paid consultant to

candidate(s) for federal, state, or local office or a political action committee since 2010 (*id.* ¶ 15). Plaintiff Mary Shinkle was an employee of Republican Congressman Mike Bishop, a federal elected official, between 2015 and 2018 (*id.* ¶ 17).

"*Employee of the Legislature*," MICH. CONST. Art. IV, § 6 (1)(b)(v). Plaintiff Stephen Daunt has been an employee of the Michigan Legislature since January 1, 1991 (Compl. ¶ 11, ECF 1 at PageID.6).

"*Any person who is registered as a lobbyist agent with the Michigan bureau of elections…,*" MICH. CONST. Art. IV, § 6 (1)(b)(iv). Plaintiff Anthony Daunt has served as a registered lobbyist agent in the State of Michigan since August 2013 (Compl. ¶ 7, ECF 1 at PageID.5).

"*An unclassified state employee who is exempt from classification…,*" MICH. CONST. Art. IV, § 6 (1)(b)(vii). Plaintiff Koutsoubos was an unclassified state employee between March 2014 and June 2017 (Compl. ¶ 13, ECF 1 at PageID.6).

"*[A] parent, stepparent, child, stepchild, or spouse of any individual disqualified under part (1)(b),*" MICH. CONST. Art. IV, § 6 (1)(c). Plaintiffs Norm and Mary Shinkle are husband and wife (Compl. ¶ 17-18, ECF 1 at PageID.7). Plaintiffs Clint Tarver and Linda Lee Tarver are husband and wife (*id.* ¶ 21). Plaintiff Paul Sheridan is the son of Plaintiff Marian Sheridan (*id.* ¶ 19). And Plaintiff Bridget Beard is the daughter of Plaintiff Marian Sheridan (*id.* ¶ 20).

The Lead Plaintiffs indicate that they "each desire to serve on the Commission but are excluded from consideration" (Compl. ¶ 39, ECF 1 at PageID.17). The Lead Plaintiffs seek to have this Court (1) declare the Commission "unconstitutional and invalid and the administration of the selection of commissioners a violation of Plaintiffs' constitutional rights," and (2) enjoin Defendant Benson and her employees and agents from administering or preparing for the selection

of commissioners to serve on the Commission (*id.* at PageID.31). Plaintiffs accompanied their Complaint with a Motion for a Preliminary Injunction (ECF No. 4), specifically seeking to have this Court "direct the Secretary of State to suspend her implementation of all provisions of the Michigan Constitution relating to the Commission including any preparations for the selection of commissioners" (*id.* at PageID.90). The Lead Plaintiffs have also since filed a Motion for a Status Conference (ECF No. 64), pointing out that Secretary Benson has "already taken several crucial steps towards implementation" of the Commission (*id.* at PageID.915).

**2.    The Member Case**

On August 22, 2019, the MRP and five individual Plaintiffs filed the Member Case, alleging the following five claims:

   I.    Violation of Freedom of Association [MRP]
  II.    Violation of Freedom of Association [Individual Plaintiffs]
 III.    Violation of Freedom of Speech—Viewpoint Discrimination
 IV.    Violation of Freedom of Speech—Restricted Speech
  V.    Violation of Equal Protection

Like the Lead Plaintiffs, the Member Plaintiffs also challenge the eligibility criteria of amended Article 4. It is not in dispute that the MRP is a "major political party" as that term is defined in Michigan's Election Law, MICH. COMP. LAWS § 168.16, and used in the challenged provisions. Plaintiffs make the following allegations relevant to four of the enumerated categories:

*"Declared candidate for partisan federal, state, or local office,"* MICH. CONST. Art. IV, § 6 (1)(b)(i). Plaintiff Laura Cox has, within the past six years, been a declared candidate for the partisan offices of state representative and state senator (Member Compl. ¶ 21, ECF No. 1 at PageID.5). Within the past six years, Plaintiff Terri Lynn Land was a declared candidate for United States Senator and precinct delegate, both partisan offices (*id.* ¶ 22). Within the past six years, Plaintiff Dorian Thompson was also a candidate for the partisan office of precinct delegate

(*id.* ¶ 24). Plaintiff Hank Vaupel was a declared candidate for state representative within the past six years (*id.* ¶ 25).

*"Elected official to partisan federal, state, or local office*," MICH. CONST. Art. IV, § 6 (1)(b)(ii). Plaintiff Cox served as a Wayne County Commissioner from 2005 through 2014, and as a state representative from 2015 through 2018 (Member Compl. ¶ 21, ECF No. 1 at PageID.5). Plaintiffs Land and Thompson served as elected precinct delegates (*id.* ¶¶ 22 & 24). Plaintiff Vaupel is currently an elected state representative (*id.* ¶ 25).

*"Officer or member of the governing body of a national, state, or local political party,"* MICH. CONST. Art. IV, § 6 (1)(b)(iii). Plaintiff Cox is currently the chair of the MRP (Member Compl. ¶ 21, ECF No. 1 at PageID.5). Plaintiff Land is currently the chair of the 3rd Congressional District for MRP and in that capacity serves as a member of the MRP State Committee (*id.* ¶ 22). Land also served as the "National Committeewoman" of the MRP from 2012 through 2014 (*id.*). Plaintiff Vaupel is currently a member of the Livingston County Republican Party Executive Committee (*id.* ¶ 25).

*"[A] parent, stepparent, child, stepchild, or spouse of any individual disqualified under part (1)(b),"* MICH. CONST. Art. IV, § 6 (1)(c). Plaintiff Savina Alexandra Zoe Mucci is the daughter of Tonya Schuitmaker, who is a former state senator and was the declared candidate for the office of attorney general in the 2018 election (Member Compl. ¶ 23, ECF No. 1 at PageID.6).

The Member Plaintiffs allege that they each "wish to apply to serve on the [C]ommission when applications are made available but are ineligible to hold such public office under the terms of the VNP Proposal" (Member Compl. ¶ 61, ECF No. 1 at PageID.15).[2] The Member Plaintiffs

---

[2] Although Michigan voters approved the "VNP proposal" more than one year ago and the amendments have been in effect since December 22, 2018, Plaintiffs' Complaint (and their motion

seek to have this Court (1) "declar[e] the VNP Proposal unconstitutional under the First and Fourteenth Amendments to the United States Constitution," and (2) "enjoin[] Defendant from implementing, administering, or otherwise enforcing the VNP Proposal" (*id.* at PageID.24). The Member Plaintiffs accompanied their Complaint with a Motion for a Preliminary Injunction (Member Case, ECF No. 2), requesting "an Order enjoining Defendant Secretary of State, and her employees and agents, from implementing all provisions of the VNP Proposal" (Member Case, ECF No. 3 at PageID.75). The Member Plaintiffs have also joined in the Lead Plaintiffs' request for a Status Conference (ECF No. 66).

## II.    ANALYSIS

### A.    Motion Standard

"Preliminary injunctions are 'extraordinary and drastic remed[ies] ... never awarded as of right.'" *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 453 (6th Cir. 2014) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (examining a preliminary injunction that preserved the state-law status quo)). "[T]hat is why the plaintiff bears the burden to justify relief, even in First Amendment cases." *Id.* (citing *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974)). Further, a plaintiff "bears the burden of showing that he has standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing the [standing] elements.").

Federal Rule of Civil Procedure 65, which governs the issuance of preliminary injunctions,

---

briefing) nonetheless repeatedly uses the phrase "VNP Proposal." The Court has simply interpreted Plaintiffs' references to the "proposal" to mean the enacted provisions.

does not explicitly require the court to conduct an evidentiary hearing before issuing an injunction. FED. R. CIV. P. 65(a)(1). The Sixth Circuit Court of Appeals has held that an evidentiary hearing is only required when there is a disputed factual issue and the documentary evidence upon which to base an informed, albeit preliminary, conclusion is inadequate. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 552-53 (6th Cir. 2007); *S.E.C. v. G. Weeks Sec., Inc.,* 678 F.2d 649, 651 (6th Cir. 1982). Here, as noted, there are no contested facts, and there is an adequate basis for reaching informed, albeit preliminary, conclusions in these cases.

In evaluating a request for a preliminary injunction, a district court should consider: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Platt, supra*; *McNeilly, supra.* "[T]he district court balances four factors—not one—even in First Amendment cases." *Platt, supra* (citing, e.g., *Doran v Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) (separately balancing "irreparable injury" in a First Amendment case)).

That said, the factors of irreparable harm and consideration of the public interest largely depend on whether a constitutional violation exists. *Libertarian Party of Ohio v. Hulsted*, 751 F.3d 403, 412 (6th Cir. 2014); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689-90 (6th Cir. 2014). Therefore, the Court will focus its analysis on Plaintiffs' likelihood of success on the merits of each of their respective claims. The Court will then briefly discuss the remaining factors to determine whether, on balance, the factors weigh in favor of granting or denying preliminary injunctive relief. *See also O'Toole v. O'Connor*, 802 F.3d 783, 792 (6th Cir. 2015) (observing that while "the 'likelihood of success' prong is the most important," it is "only one of the factors to be

considered by a court"). The final two stay factors, the harm to others and the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Gun Owners of Am., Inc. v. Barr*, No. 19-1298, 2019 WL 1395502, at *1 (6th Cir. Mar. 25, 2019); *Slyusar v. Holder*, 740 F.3d 1068, 1074 (6th Cir. 2014).

Last, the Court observes that "[w]hile the grant of a stay is governed by legal standards, it is ultimately subject to a court's discretion." *Slyusar*, 740 F.3d at 1074 (citing *Nken, supra*). *See also Louisiana-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019) (instructing that a court should "balance rather than tally these factors").

### B. Threshold Questions

### 1. Standing

VNP contends that this Court should conclude, at the outset, that the Lead Plaintiffs lack standing to assert their claims for the relief requested (ECF No. 32 at PageID.356). Specifically, VNP first argues that the Lead Plaintiffs cannot establish standing in this matter where there is no basis for the Court to conclude that it would be "likely," as opposed to purely "speculative," that an inability to serve on the Commission would be remedied by a favorable decision in this matter (*id.* at PageID.356-357). According to VNP, Plaintiffs would have the "same minimal chance of being randomly selected that any other applicant would have" (*id.*). Second, VNP argues that the prayer for relief made in the Lead Plaintiffs' Complaint and their present Motion for Preliminary Injunction shows that they are not seeking a remedy that would allow them an opportunity to serve on the new Commission at all (*id.* at PageID.357). VNP argues that Plaintiffs are "instead asserting, and seeking a remedy for, a generalized grievance shared by everyone who voted 'no' on Proposal 18-2" (*id.*). VNP makes the same argument with regard to the individual Plaintiffs in the Member Case (ECF No. 36 at PageID.445-454).

In response, the Lead Plaintiffs argue that they easily demonstrate injury in fact where they are currently banned from Commission eligibility because of their prior exercise of First Amendment rights (ECF No. 57 at PageID.818-819). Plaintiffs assert that "forcing" them to choose between eligibility and continuing to exercise their First Amendment rights is, on its own, an adequate basis for standing (*id.* at PageID.819-820). Plaintiffs opine that their injuries would clearly be redressed by a decision providing the requested injunctive relief or by "the invalidation of the Commission in its entirety" (*id.* at PageID.820-821). Plaintiffs in the Member Case similarly respond that they have adequately shown both injury in fact and redressability (ECF No. 54 at PageID.770-778).

**VNP's argument lacks merit.**

Article III, § 2 of the United States Constitution provides that the judicial power of the federal courts "extends only to 'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, ___ U.S. ___; 136 S. Ct. 1540, 1547 (2016) (quoting U.S. CONST. Art. III, § 2). Standing "ensure[s] that federal courts do not exceed their authority" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* The doctrine of standing, which is one of several doctrines that reflect this fundamental limitation, requires federal courts to satisfy themselves that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." *Summers*, 555 U.S. at 493 (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)).

The "irreducible constitutional minimum of standing" requires the plaintiff to show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision." *State by & through Tennessee Gen. Assembly v. United States Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019) (quoting *Lujan*, 504 U.S. at 560). *See also Hearring v. Sliwowski*, 806 F.3d 864, 868 (6th Cir. 2015) ("To establish standing for a forward-looking injunction, a party must show a 'threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical.'") (quoting *Summers*, 555 U.S. at 493).

Here, VNP's first argument relies on identifying Plaintiffs' injury as the ultimate denial of membership on the Commission, which VNP argues is an abstract and speculative injury. In contrast, Plaintiffs have claimed that their *ineligibility* is their injury, an injury in fact that is both particularized to them and concrete. For purposes of this standing inquiry, the Court presumes the truth of Plaintiffs' allegations about their ineligibility under the eight delineated categories. *See, e.g., Meese v. Keene*, 481 U.S. 465, 473 (1987) ("Whether the statute in fact constitutes an abridgement of the plaintiff's freedom of speech is, of course, irrelevant to the standing analysis.") (internal quotation marks, citations, and alterations omitted). With this characterization of Plaintiffs' alleged injuries in mind, the Court determines that Plaintiffs have sufficiently alleged at least a minimal injury arising from their First Amendment claims, a personal stake in the controversy that is concrete.

Additionally, the Court determines that Plaintiffs have sufficiently alleged injury in fact arising from their equal protection claims. In their respective equal protection claims, Plaintiffs allege that the challenged categories violate their rights to equal protection because the categories treat those who are exercising their First Amendment rights differently from those who are not exercising such rights (Lead Compl. ¶¶ 67-68; Member Compl. ¶¶ 117-122). "The injury in fact in an equal protection case of this variety is the denial of equal treatment resulting from the

imposition of the barrier, not the ultimate inability to obtain the benefit." *Gratz v. Bollinger*, 539

U.S. 244, 262 (2003) (internal quotation marks and alterations omitted).

VNP's second argument is that Plaintiffs lack standing because their prayer for relief and

the present motions for a preliminary injunction show that they are not seeking a remedy that

would allow them an opportunity to serve on the new Commission at all, i.e., that Plaintiffs have

not suffered an injury "that is likely to be redressed by a favorable judicial decision." *Lujan*, 504

U.S. at 560-61.  However, Plaintiffs seek, at least in relevant part, that this Court declare the

selection of commissioners a violation of their constitutional rights.  The present motion in the

Lead Case specifically seeks for Secretary Benson to "suspend her . . . preparations for the

selection of commissioners" (ECF No. 4 at PageID.90).  A favorable decision in these cases would

provide such redress.  *Contrast Hearring*, 806 F.3d at 867 (where the plaintiffs "never sought [the]

injunction" that was issued).

Thus, the Court concludes that Plaintiffs' Complaints adequately allege Article III standing

sufficient to warrant their invocation of federal-court jurisdiction.

## 2. Laches

Secretary Benson argues that this Court should refuse to entertain Plaintiffs' claims based

on application of the doctrine of laches.  Secretary Benson emphasizes that the amendment was

passed on November 6, 2018, yet the Lead Plaintiffs did not file their Complaint until July 30,

2019 (ECF No. 39 at PageID.569-572).  Secretary Benson emphasizes that "this is a case seeking

to enjoin the operation of an amendment to the method of drawing electoral districts more than

three-quarters of a year after the amendment was passed, and on the eve of mailing applications

for citizens to join the Commission" (*id.* at PageID.571). Secretary Benson opines that Plaintiffs'

delay prejudices her, as her "interest in proceeding with the election increases in importance" as

the deadline for mailing applications looms (*id.* at PageID.572). Secretary Benson makes essentially the same laches argument in the Member Case, pointing out that the Plaintiffs did not file their complaint until August 22, 2019, almost one month after even the filing of the Lead Case (ECF No. 45 at PageID.665-669).

In reply, the Lead Plaintiffs argue that the doctrine of laches does not apply to their claims because they expressly seek only injunctive relief against ongoing and recurring harm (ECF No. 57 at PageID.832-834). Plaintiffs also assert that their delay in filing was not unreasonable as "the landscape of the Commission has been developing" and that "[t]here can be no prejudice to Defendant where she has unconstitutionally excluded individuals for eligibility" (*id.* at PageID.834-836). The Member Plaintiffs similarly argue that laches is inapplicable to their claims for relief (ECF No. 54 at PageID.779-780).

**Secretary Benson's argument lacks merit.**

"Where a plaintiff seeks solely equitable relief, his action may be barred by the equitable defense of laches if (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant was prejudiced by this delay." *Am. Civil Liberties Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 647 (6th Cir. 2004) (citing *Brown-Graves Co. v. Cent. States, Se. and Sw. Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000)). Secretary Benson makes a sound argument on both factors. *Cf. Crookston v. Johnson*, 841 F.3d 396, 399 (6th Cir. 2016) (explaining that the plaintiff's "belated challenge to Michigan's election procedures prejudices the State's interest in holding orderly elections").

However, Plaintiffs accurately point out that the doctrine does not prevent a plaintiff from obtaining prospective injunctive relief, which is all that Plaintiffs in these cases seek. "Laches only bars damages that occurred before the filing date of the lawsuit." *Nartron Corp. v.*

*STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002). *See also Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997) (holding that "a law that works an ongoing violation of constitutional rights does not become immunized from legal challenge" merely because the plaintiff failed to sue within the applicable statute of limitations); *Ohio A. Philip Randolph Inst. v. Smith*, 335 F.Supp.3d 988, 1002 (S.D. Ohio 2018) (three-judge panel holding that laches does not apply as a matter of law to partisan gerrymandering claims).

Therefore, assuming arguendo that Plaintiffs have standing to invoke this Court's jurisdiction and that laches does not bar consideration of their claims, the Court turns to examination of the factors for preliminary injunctive relief in each case.

### C.    The Lead Case

**1.    Likelihood of Success on the Merits**

**a.    <u>First Amendment</u> (Count I)**

The Lead Plaintiffs argue that they have a strong likelihood of success on the merits of their claim in Count I where the Commission excludes categories of individuals on a basis that infringes their First Amendment rights (ECF No. 4 at PageID.71-74). Plaintiffs argue that they have been denied both a membership benefit and a quantifiable economic benefit (*id.* at PageID.72). Relying on *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), and progeny, Plaintiffs argue that the Commission's conditions and restrictions on employment are unconstitutional because they are not adequately tailored to a sufficient government interest (*id.* at PageID.74-76).

In response, Secretary Benson argues that while Plaintiffs possess fundamental rights to political speech and association, the interests of the State plainly outweigh any burden or infringement of those rights caused by the provisions in § 6 (ECF No. 39 at PageID.547).

According to Secretary Benson, the interest of the State at issue here—establishing a fair and impartial redistricting process—is fundamental (*id.*). Secretary Benson argues that the State has a "compelling" interest in deciding who will be responsible for redistricting in Michigan (*id.* at PageID.550). Secretary Benson points out that the eight ineligibility provisions in Article IV, § 6 (1)(b) were designed "to squeeze every ounce of incumbent and legislative influence out of redistricting" by excluding persons who presently, or have within the last six years, participated in the political operation of Michigan government in a partisan or nonpartisan capacity (*id.* at PageID.552, citing Bruce E. Cain, Redistricting Commission: A Better Political Buffer?, 121 Yale L. J. 1808, 1824 (2012) (discussing California's similar provisions after which Michigan's provisions are modeled)). Secretary Benson delineates how each of the Lead Plaintiffs "has a conflict or may reasonably be perceived as having a conflict of interest based on the office or position he or she currently holds" (*id.* at PageID.559). Secretary Benson argues that in contrast, the burden on Plaintiffs' speech and association rights is both "minimal" and "temporary" where Plaintiffs, as Republicans, are eligible based on their party affiliation to apply for the four Republican seats in the 2030 redistricting cycle (*id.* at PageID.559-561).

In its response to the Lead Plaintiffs' argument, VNP asserts that Michigan's voters did not violate the First Amendment by seeking to guard against conflicts of interest, or the appearance thereof, in drawing the districts from which their representatives would be elected (ECF No. 32 at PageID.361-368). According to VNP, the Sixth Circuit has explained that the First Amendment does not prohibit taking political affiliation into account in "positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies" (*id.* at PageID.366, quoting *Sowards v. Loudon Cnty., Tenn.*, 203 F.3d 426, 436 (6th Cir. 2000)). VNP emphasizes that partisan views

and affiliations may be considered as a qualification for such positions without violating the First Amendment (*id.*). VNP argues that even if the Court could find that Plaintiffs have identified a cognizable First Amendment interest, that interest would be overcome by the state's compelling interest in enforcing the Commission's membership qualifications and prohibiting those with political or financial ties to legislators from drawing the districts that will determine who gets elected (*id.* at PageID.369-370).

**The Lead Plaintiffs have not shown a likelihood of success on the merits of Count I.**

The Lead Plaintiffs argue that they would be eligible for Commission membership but for the exercise of their First Amendment rights, i.e., that their eligibility has unconstitutional conditions. As the Sixth Circuit recently observed, "[t]he United States Constitution does not contain an Unconstitutional Conditions Clause." *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th Cir. 2019). "What it does contain is a series of individual rights guarantees, most prominently those in the first eight provisions of the Bill of Rights and those in the Fourteenth Amendment." *Id.* (ultimately examining the guarantee of due process established by the Fourteenth Amendment). The Supreme Court has held that "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, . . . [it] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Rutan*, 497 U.S. at 85 (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). *See also Planned Parenthood*, 917 F.3d at 911 ("The government may not deny an individual a benefit, even one an individual has no entitlement to, on a basis that infringes his constitutional rights.").

The Lead Plaintiffs identify the allegedly imperiled rights in this case as their rights to "freedom of speech (e.g., by the exclusion of candidates for partisan office or by the activities of

certain relatives), right of association (e.g., by the exclusion of members of political parties or by the activities of certain relatives), and/or the right to petition (e.g., by the exclusion of registered lobbyists or by the activities of certain relatives)" (ECF No. 4 at PageID.73). *See generally Elrod v. Burns*, 427 U.S. 347, 355-58 (1976) ("[P]olitical belief and association constitute the core of those activities protected by the First Amendment.").

The Lead Plaintiffs frame their claim within the context of "conditional hiring decisions" (*see* Compl. ¶¶ 25, 38, 44, citing *Rutan*, 497 U.S. 62 ("low-level" state employees and employment applicants filed § 1983 action alleging that they had suffered discrimination in state employment because they had not been Republican Party supporters and that this discrimination violates the First Amendment); *Vickery v. Jones*, 856 F. Supp. 1313, 1318 (S.D. Ill. 1994) (the plaintiff contended that he was denied a second six-month contract as highway maintainer because of the defendant's patronage system), aff'd, 100 F.3d 1334 (7th Cir. 1996)).

VNP likewise examines Plaintiffs' allegedly imperiled rights within the context of personnel decisions, urging the Court to conclude that policymaking positions—and partisan balance commissions in particular—are "exempt" from the rule precluding personnel decisions based upon partisan or political factors. *See Branti v. Finkel*, 445 U.S. 507, 518 (1980) (two county assistant public defenders brought § 1983 action based on the allegation that the newly appointed public defender for the county was about to discharge the plaintiffs solely because they were Republicans); *Sowards*, 203 F.3d at 436 (former jailer brought § 1983 action against county and sheriff alleging she was terminated in retaliation for exercising her First Amendment rights).

In contrast, Secretary Benson, pointing out that members of Michigan's Independent Citizens Redistricting Commission will be state officers, not state employees (ECF No. 39 at PageID.549, n.10), instead examines Plaintiffs' First Amendment rights within the context of state

election law cases.  The Court determines that the election law cases provide the better framework for examining the constitutionality of the criteria for membership on a state redistricting commission.  The caselaw examining an employer's discrete hiring decisions does not, in the Court's view, sufficiently encompass the interests at stake in this case.  Redistricting "goes to the heart of the political process" in a constitutional democracy.  *In re Apportionment of State Legislature—1982*, 321 N.W.2d 565, 581 (Mich. 1982).  *See also Rucho*, ___ U.S. at ___; 139 S. Ct. at 2498 ("[t]he opportunity to control the drawing of electoral boundaries through the legislative process of apportionment is a critical and traditional part of politics in the United States") (citation omitted).

"First Amendment challenges to state election regulations are evaluated under the three-step *Anderson-Burdick* framework," a framework derived from the holdings in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  *Schmitt v. LaRose*, 933 F.3d 628, 639 (6th Cir. 2019) (examining statutes governing Ohio's municipal ballot-initiative process).  *Anderson* and *Burdick* "define and limit a State's ability to impose certain types of regulatory procedures relating to the election process."  *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 924 (6th Cir. 1998) (examining a Michigan constitutional amendment imposing lifetime term limits on state legislators under the *Anderson-Burdick* balancing test).[3]  "[T]he touchstone of *Anderson-Burdick* is its flexibility in weighing competing interests. . ."  *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (quoting *Burdick*, 504 U.S. at 434).

---

[3] Interestingly, the Sixth Circuit in *Citizens for Legislative Choice*, also briefly analyzed the rights and interests involved in the term-limit amendment under a "Deferential Approach," an approach based on a State's sovereign authority to structure its government, concluding that it would also alternatively affirm the decision to grant the State summary judgment under this approach.  144 F.3d at 924-925.  Neither side has proposed use of the Deferential Approach in this case, although the Court observes that the authority of the State to determine the qualifications of its elective and nonelective positions underpins the *Anderson-Burdick* balancing of the interests in this case.

*Cf. Anderson*, 460 U.S. at 787 (examining "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters ... to cast their votes effectively") (citation omitted).

Under the *Anderson-Burdick* framework, courts "weigh the character and magnitude of the burden the State's rule imposes on [Plaintiffs' First Amendment] rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Schmitt*, 933 F.3d at 639 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citations and internal quotation marks omitted)).  The first, most critical step is to consider the severity of the restriction.  *Id.*  Laws imposing "severe burdens on plaintiffs' rights" are subject to strict scrutiny, but "lesser burdens ... trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (citations and internal quotation marks omitted).  Regulations that fall in the middle "warrant a flexible analysis that weighs the state's interests and chosen means of pursuing them against the burden of the restriction."  *Id.* (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016) (citation and internal quotation marks omitted)).  At the second step, courts identify and evaluate the state's interests in and justifications for the regulation.  *Id.* The third step requires that courts "assess the legitimacy and strength of those interests" and determine whether the restrictions are constitutional.  *Id.*

The eligibility provisions at issue do not impose severe burdens on Plaintiffs' First Amendment rights.  There is no right to state office or appointment.  The right to become a candidate for state office, like the right to vote for the election of state officers, is a privilege of citizenship.  *Snowden v. Hughes*, 321 U.S. 1, 7 (1944).  *Cf. Bullock v. Carter*, 405 U.S. 134, 142-43 (1972) ("[T]the Court has not heretofore attached such fundamental status to candidacy as to

invoke a rigorous standard of review."). Nor, as Secretary Benson points out, are the burdens permanent.

In contrast, the State has a compelling interest in deciding who will be responsible for redistricting in Michigan. "As a sovereign polity, Michigan has a fundamental interest in structuring its government." *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 923 (6th Cir. 1998) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). "Any change in the means by which the members of the Legislature are chosen is a fundamental matter." *In re Apportionment of State Legislature—1982*, 321 N.W.2d at 581. A court's scrutiny will not be "so demanding where we deal with matters resting firmly within a State's constitutional prerogatives." *Gregory*, 501 U.S. at 462-63.

And "[t]he reality is that districting inevitably has and is intended to have substantial political consequences." *Gaffney v. Cummings*, 412 U.S. 735 (1973). "Politics and political considerations are inseparable from districting and apportionment." *Id.* In their quest to ensure that the redistricting process can no longer be dominated by one political party, *Citizens Protecting Michigan's Constitution*, 922 N.W.2d at 410, a majority of Michigan voters provided for "the character of those who [will] exercise [the] government authority" of redistricting by prescribing the eligibility requirements for the Commission. *Gregory*, 501 U.S. at 460 (examining a state constitutional provision through which the people of Missouri established a qualification for those who sit as their judges). And the Michigan Constitution requires Commission members to perform their duties "in a manner that is impartial and reinforces public confidence" in the redistricting process. MICH. CONST., Art. 4, § 6 (10).

In sum, when balancing the *Anderson-Burdick* factors, while the First Amendment is a check on the State's authority, the State's interests in designating eligibility criteria for an effective

redistricting commission are more than sufficient to justify the challenged provisions. The Court determines Plaintiffs are therefore unlikely to succeed on the merits of their First Amendment claim in Count I.

**b. Equal Protection (Count II)**

Plaintiffs argue that they also have a strong likelihood of success on the merits on their Equal Protection claim in Count II because the "exclusionary factors … burden[] only individuals that fall into set categories because of an exercise of First Amendment rights that may indicate partisan bias, while imposing no restriction on individuals who may be just as partisan, or more partisan" (ECF No. 4 at PageID.76, 79). Plaintiffs argue that "the government interest is not a sufficient fit with the restrictions to justify the distinction the challenged provision draws between Plaintiffs and all other eligible registered voters" (*id.* at PageID.76). Plaintiffs argue that "[t]hese exclusions are not justified by the stated interests of implementing a 'fair, impartial, and transparent redistricting process' because excluding Plaintiffs from the Commission cannot be adequately linked to the achievement of those goals" (*id.* at PageID.77, 81).

In response, Secretary Benson argues that there is more than a sufficient rational relationship between the disparate treatment of Plaintiffs and the government's interests (ECF No. 39 at PageID.564). Specifically, Secretary Benson maintains that "the manifest purpose of the amendment is to transfer the power of establishing legislative districts from the legislature and the political parties who dominate it to the hands of citizens without a personal stake in the details of how and where those districts are drawn" (*id.*). Secretary Benson opines that the government's legitimate interest in protecting the legitimacy of the people's chosen redistricting system is a clearly rational reason to exclude these categories of person from the Commission (*id.* at PageID.565). Secretary Benson argues that like other anti-nepotism statutes and restrictions, there

is also a rational basis to exclude certain close family relations of that political class of persons, who can be presumed to have a financial or other interest in the outcome of the redistricting on behalf of their relatives (*id.* at PageID.565-566). Secretary Benson emphasizes that the Lead Plaintiffs' exclusion is not based upon their chosen party affiliation but upon their real or apparent conflicts of interest, i.e., their professional or financial reliance, as to the outcome of the decisions the Commission will be required to make (*id.* at PageID.567-568).

**The Lead Plaintiffs have not shown a likelihood of success on the merits of Count II.**

The United States Supreme Court has "long held that 'a classification neither involving fundamental rights nor proceeding along suspect lines ... cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012) (quoting *Heller v. Doe*, 509 U.S. 312, 319-20 (1993)). For the reasons previously stated, the Lead Plaintiffs are unlikely to succeed in demonstrating that the eligibility criteria impose a severe burden on their First Amendment rights. And the Lead Plaintiffs do not belong to any suspect classification such as race or religion. Per the allegations in their Complaint, the Lead Plaintiffs are partisan candidates or elected officials, political party officers, paid political consultants, legislative employees, lobbyists and/or certain close relatives of the same. For the reasons previously stated and more fully stated by Secretary Benson, the difference in treatment between persons within and outside these eight enumerated categories rationally furthers a legitimate state interest in establishing a fair and impartial redistricting process.

Accordingly, the Lead Plaintiffs have not demonstrated a strong likelihood of success on the merits of either of their claims.[4] This first preliminary injunction factor therefore balances in Defendants' favor.

## 2. Irreparable Injury

On the second preliminary injunction factor, Plaintiffs argue that absent an injunction, they will suffer irreparable injury by their ineligibility for participation in the Commission (ECF No. 4 at PageID.86). Specifically, they argue that they are "banned from consideration and eligibility for participation in the Commission while also facing the sophie's choice of continuing to exercise their First Amendment rights and participate in the political process, or forego that protected participation in order to someday gain eligibility to participate in the Commission" (*id.* at PageID.87).

Secretary Benson argues that Plaintiffs have not demonstrated any irreparable injury where there is no associational or expression-based exclusion of their viewpoints, because, "by the express terms of the amendment, there will be persons affiliating with their political party on the Commission, and Plaintiffs otherwise remain to affiliate and express their views" (ECF No. 39 at PageID.573-574). Second, Secretary Benson argues that to whatever extent Plaintiffs raise a claim based on "exclusion from state employment," that is not an "irreparable" injury but an injury for which Plaintiffs could receive monetary compensation for the pay they might have received as

---

[4] Plaintiffs also argue that where the eligibility provisions are unconstitutional, "there is a strong likelihood that the entire Commission will be declared invalid" because the unconstitutional provisions of the amendment are not severable from the remaining provisions regarding the Commission under the precedent and the circumstances presented here, which include the voters' belief that such restrictions were a vital part of the overall proposal (ECF No. 4 at PageID.81-85). Because the Court has determined that Plaintiffs are not likely to succeed on the merits of their constitutional claims, the Court declines, at this juncture, to address the effect of the severability provision.

Commission members (*id.* at PageID.574).  Secretary Benson argues that to the extent Plaintiffs allege that they may be unconstitutionally excluded from service on the Commission, applications are not due until June 2020, and there is time enough to fully litigate the issues (*id.*).

VNP argues that the new constitutional language is entitled to a presumption of constitutionality and that there is ample time and opportunity for adjudication of Plaintiffs' claims and enforcement of any relief that might be ordered in this matter (ECF No. 32 at PageID.352).

Again, the remaining factors largely depend on whether a constitutional violation exists. *Libertarian Party*, 751 F.3d at 412.  For example, "it is well-settled that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* (quoting *Elrod*, 427 U.S. at 373).  Here, the Court has determined that the Lead Plaintiffs are unlikely to prevail on the merits of their constitutional claims.  Further, Defendants' points that the Lead Plaintiffs' injuries are, in fact, not irreparable absent a preliminary injunction are well taken.  This factor therefore also balances in Defendants' favor.

3. **Substantial Injury & Public Interest**

The Lead Plaintiffs briefly argue that granting an injunction will not cause substantial harm to others and is in the public interest (ECF No. 4 at PageID.87-88).

In response, Secretary Benson argues that an injunction will irreparably harm the State inasmuch as any delay in the process will effectively prevent the Secretary from completing the necessary tasks to meet the constitutionally-mandated January 1 deadline for mailing applications and timely complete the random selection process for members of the Commission to, in turn, timely complete their duties (ECF No. 39 at PageID.575).  Secretary Benson argues that an injunction will also irreparably harm Michigan's citizens because the challenged constitutional amendment was duly enacted by the Michigan voters as an expression of their will as to whom

they wanted to exercise the power of drawing their electoral districts (*id.*). Secretary Benson argues that the people have a strong interest in having their Constitution effectuated (*id.* at PageID.576).

VNP similarly points out that "in light of the unwarranted disruption of the constitutional process that would be brought about by the requested preliminary injunction, it is also plain that the public interest would not be served by an order granting that relief" (ECF No. 32 at PageID.352).

"[T]he public interest lies in a correct application of the federal constitutional and statutory provisions upon which the claimants have brought this claim and ultimately. . . upon the will of the people of Michigan being effected in accordance with Michigan law." *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (internal quotation and citation omitted). Even if the Court viewed the merits of the Lead Plaintiffs' claims differently, preserving the status chosen by the voters more than one year ago is important as this case progresses through the courts toward final resolution. These last two factors therefore balance in Defendants' favor.

In sum, the Court, in its discretion, determines that awarding the kind of relief that the Supreme Court has characterized as "extraordinary" and "drastic," *Munaf*, 553 U.S. at 690; *Platt*, 769 F.3d at 454, is not justified in this case. Rather, the Court denies the Lead Plaintiffs' motion for a preliminary injunction.

### D.     The Member Case

**1.     Likelihood of Success on the Merits**

**a.     Freedom of Association (Count I)**

In support of the merits of MRP's Freedom of Association claim in Count I, the Member Plaintiffs rely heavily on the Supreme Court's decision in *California Democratic Party v. Jones*,

530 U.S. 567 (2000), and the right of a political party to select its "standard bearers" and exclude persons from membership (Member Case, ECF No. 3 at PageID.57-60; Member Compl. ¶ 72, ECF No. 1 at PageID.16; ECF No. 54 at PageID.739-741). Plaintiffs argue that like the challenged provision in *Jones,* a California proposition that converted the state's primary election from a closed to a blanket primary, the challenged provisions in this case similarly violate the rights to associate and not to associate because "applicants for commissioner self-designate their affiliation with one of the two major political parties without any involvement or consent of that political party" (Member Case, ECF No. 3 at PageID.60). Plaintiffs argue that the challenged provisions will "result in a situation where those who do not represent MRP's interests are selected as Republican commissioners" (*id.*).

In response, Secretary Benson argues that Plaintiffs' claim that the commissioners will be their "standard bearers" and representatives is based upon a fundamental misunderstanding of what the Commission is and who its members will be: "Commissioners are not party nominees or candidates, and so they are not chosen to be party standard bearers or to deliver the party's message" (ECF No. 45 at PageID.636-639). Secretary Benson emphasizes that the point of the movement driven by "Voters Not Politicians" was to have the districts drawn by the voters, rather than legislators or political insiders; therefore, the enacted provisions do not require that the applicants be actual *members* of any party—they need only attest to whether they affiliate themselves with a party (*id.* at PageID.638-639 [emphasis in original]). Secretary Benson also points out that the MRP has not alleged that it has, or could properly develop, a process to prevent or exclude people from voting for its candidates or claiming affinity with MRP (*id.* at PageID.640). Last, Secretary Benson points out that the MRP has remedies to pursue if it believes an individual is attempting to perpetrate some fraud in his or her application (*id.* at PageID.641).

In response, VNP argues that the commissioner selection process does not violate MRP's freedom of association (ECF No. 36 at PageID.456-461). VNP points out that unlike a political party's nominee for elected office, a commissioner on Michigan's independent redistricting commission does not "determine[ ] the party's positions on the most significant public policy issues of the day" or "become[ ] the party's ambassador to the general electorate in winning it over to the party's views" (*id.* at PageID.458, quoting *Jones*, 530 U.S. at 575). Nor, argues VNP, are redistricting commissioners tasked with being "a standard bearer who best represents the party's ideologies and preferences" (*id.*, quoting *Jones, supra*). VNP emphasizes that the contrary is instead true—"the voters of Michigan determined that commissioners should be prohibited from seeking to advantage political parties in adopting redistricting plans" (*id.*, citing MICH. CONST. Article IV § 6(13)(d) ("Districts shall not provide a disproportionate advantage to any political party.")). VNP concludes that "political parties have no First Amendment associational right to dictate the membership of government commissions" (*id.* at PageID.459).

**The Member Plaintiffs have not shown a likelihood of success on the merits of Count I.**

"[T]he freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973) (citations omitted). "The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Id.*

In *Jones*, 530 U.S. at 577, the Supreme Court held that California's blanket primary unconstitutionally "forces political parties to associate with—to have their nominees, and hence their positions, determined by—those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated with a rival." Here, however, unlike the provision in *Jones*, neither

the Michigan constitutional amendment nor membership in the Commission defines what it means to be a Republican or a Democrat.  As a result, *Jones* is simply inapplicable.  Further, because the position of redistricting commissioner is randomly drawn from pools of voters, there is no basis for the commissioners to be regarded as "standard bearers" for the parties.  Rather, as Secretary Benson powerfully indicates, "Commissioners will be drawn from the same people to whom the parties will later appeal to *vote for* those standard bearers and representatives" (ECF No. 45 at PageID.640 [emphasis in original]).

### b.  **Freedom of Association** (Count II)

In the individual Plaintiffs' Freedom of Association claim in Count II, the Member Plaintiffs allege that they express their political affiliation with the Michigan Republican Party through one or more of the roles described in the Commission's disqualifying criteria (Member Compl. ¶ 81, ECF No. 1 at PageID.19).  The Member Plaintiffs argue that the criteria are "overly broad" and create a prospective "total bar to service" on the Commission based on *past* political activities, regardless whether those political activities would continue during the individual's term of office (Member Case, ECF No. 3 at PageID.62-64 [emphasis in original]; *see also* ECF No. 54 at PageID.745).

In response, Secretary Benson argues that the Member Plaintiffs' argument on the merits of Count II also "misses the mark" (ECF No. 45 at PageID.642).  Like her argument in the Lead Case, Secretary Benson argues that while the individual Plaintiffs in the Member Case possess a fundamental right to freedom of association, the interests of the State plainly outweigh any burden or infringement of those rights caused by the provisions in § 6 (*id.* at PageID.644).  According to Secretary Benson, the interest of the State at issue here—establishing a fair and impartial redistricting process—is fundamental (*id.*).  Secretary Benson argues that the State has a

"compelling" interest in deciding who will be responsible for redistricting in Michigan (*id.* at PageID.644). Secretary Benson reiterates that the ineligibility provisions were designed "to squeeze every ounce of incumbent and legislative influence out of redistricting" by excluding persons who presently, or have within the last six years, participated in the political operation of Michigan government in a partisan or nonpartisan capacity (*id.*). Secretary Benson delineates how each individual Plaintiff in the Member Case "has a conflict or may reasonably be perceived as having a conflict of interest based on the office or position he or she currently holds" (*id.* at PageID.647-649). Last, Secretary Benson argues that the burden on Plaintiffs' association rights is both "minimal" and "temporary" where Plaintiffs, as Republicans, are eligible based on their party affiliation to apply for the four Republican seats in the 2030 redistricting cycle (*id.* at PageID.649-650).

VNP similarly responds that the Commission's qualification requirements do not violate the individual Plaintiffs' First Amendment freedom of association (ECF No. 36 at PageID.462). VNP argues that the individual Plaintiffs are also particularly wrong to contend that they face a "total bar to service on the commission" where their conflicts of interest only preclude their service for a period of six years after the relevant activity ends (*id.* at PageID.463, citing MICH. CONST. Article IV § 6(1)(b) and *Clements v. Fashing*, 457 U.S. 957, 967 (1982) (explaining that "[a] 'waiting period' is hardly a significant barrier to candidacy" and that it had previously "upheld a 7-year durational residency requirement for candidacy")).

**The Member Plaintiffs have not shown a likelihood of success on the merits of Count II.**

For the reasons previously stated by the Court and more fully stated by Defendants, while the First Amendment is a check on the State's authority, the State's interests in designating

38

eligibility criteria for an effective redistricting commission are, on balance, more than sufficient to justify the challenged provisions.

### c.     <u>Freedom of Speech—Viewpoint Discrimination</u> (Count III)

The Member Plaintiffs' Count III focusses on the composition of the Commission, specifically challenging that "[a]pplicants who affiliate with one of the two major parties, including MRP, are disfavored because only four positions are reserved to each of the pools of affiliating applicants, while five positions are reserved to the pool of unaffiliating applicants" (Member Compl. ¶ 94, ECF No. 1 at PageID.20). The Member Plaintiffs argue that "through the specific allocation of commissioner seats based on party affiliation—*a minority of which are reserved to each of the major political parties*—the VNP Proposal seeks to suppress speech and expression motivated by Republican ideologies and perspectives, while enhancing the perspectives of commissioners who are unaffiliated with either major party by allocating more seats to that pool of applicants" (Member Case, ECF No. 3 at PageID.66 [emphasis in original]).

In response, Secretary Benson argues that the amendment does not impose any kind of viewpoint discrimination (ECF No. 45 at PageID.653). Secretary Benson argues that Plaintiffs err in reducing the non-affiliated Commission seats to being "independent" seats, and Secretary Benson asserts that the MRP is not disadvantaged by having four members affiliated with it, as opposed to five members affiliating with all other groups and no group at all (*id.* at PageID.654). Secretary Benson also argues that a close review of the language of the amendment shows that the number of commissioners in each of the three groups has little effect on the relative power those groups will have in the Commission's decisions (*id.* at PageID.654-655). Last, Secretary Benson opines that the Member Plaintiffs' argument is ambiguous as to what "viewpoint" they claim is affected by the composition of the Commission (*id.* at PageID.655-656).

VNP similarly argues that the Commission's allocation of seats does not constitute viewpoint discrimination in violation of the First Amendment (ECF No. 36 at PageID.464). VNP argues that the Member Plaintiffs' contention that the Commission's structure suppresses Republican views while enhancing the views of those unaffiliated with the parties is factually inaccurate (*id.* at PageID.465-466). According to VNP, Plaintiffs misconceive the role of commissioners: the commissioners are not tasked with engaging in "speech and expression" to advance certain "ideologies and perspectives" (*id.* at PageID.466, quoting Pls. Brief, ECF No. 3 at PageID.66); instead, commissioners are legally obligated *not* to draw districts to favor ideologies and perspectives because that is "the very ill the Commission was designed to eliminate" (*id.* at PageID.466, citing MICH. CONST. Art. IV, § 6 (13)(d) [emphasis in original]).

**The Member Plaintiffs have not shown a likelihood of success on the merits of Count III.**

The government may not discriminate against speech based on the ideas or opinions the speech conveys. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995) (explaining that viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional"). In support of the merits of their viewpoint discrimination claim, the Member Plaintiffs rely heavily on a sentence from *McCutcheon v. FEC*, 572 U.S. 185, 207 (2014) (citation omitted), where the Supreme Court stated that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment" (Member Case, ECF No. 3 at PageID.66). At issue in *McCutcheon* was the statutory aggregate limits on how much a donor may contribute in total to political candidates or committees. The Supreme Court previously upheld the base limits as serving the permissible objective of combatting corruption, but a majority of the *McCutcheon*

Court concluded that the aggregate limits violated the First Amendment because they "do little, if anything, to address that concern, while seriously restricting participation in the democratic process." *Id.* at 193.

The Member Plaintiffs' viewpoint-discrimination claim in this case is simply misplaced. For the reasons stated more fully by Defendants, the allocation of seats on the Commission does not reflect the State's disapproval of a subset of speech. Moreover, even if the "viewpoint" that is the focus of Count III is simply that of "Republican" affiliation, then their claim is still unlikely to succeed because there is no discrimination. Members affiliated with the Republican party have the same number of members as the Democratic affiliation and more members than those reserved for those who maintain affiliation with any other party.

### d. Freedom of Speech—Restricted Speech (Count IV)

The Member Plaintiffs' Count IV focusses on the open-meeting requirement of the new § 6, which instructs that commissioners "shall not discuss redistricting matters with members of the public outside of an open meeting of the commission" except to gain relevant information, if such communication occurs either "in writing" or "at a previously publicly noticed forum or town hall open to the general public." MICH. CONST. Art. IV, § 6 (11). The Member Plaintiffs argue that the open-meeting requirement, which prohibits discussion of "an entire topic" with no compelling governmental justification, is an unconstitutional restraint on the commissioners' First Amendment freedom of speech (Member Case, ECF No. 3 at PageID.67-70; ECF No. 54 at PageID.758). The Member Plaintiffs point out that Michigan's Open Meetings Act, which requires that members of a public body deliberate toward and render decisions in an open meeting, already establishes a less restrictive alternative to the VNP Proposal (Member Case, ECF No. 3 at PageID.70).

In response, Secretary Benson argues that this claim is seriously compromised by significant legal defects, including lack of standing by the Member Plaintiffs—non-commissioners—to raise this claim and the fact that the restriction applies only to the official speech of State officials and employees, which the State may properly regulate (ECF No. 45 at PageID.656-660). Secretary Benson points out that the restriction does not impose a blanket ban; rather, commissioners remain free to discuss the operation of the Commission as a body and may discuss redistricting with the public so long as they are gathering information from the public and doing so in writing or in a public forum (*id.* at PageID.660).

VNP argues that the restriction on commissioners' discussion of redistricting outside of public Commission meetings, a time-place-manner regulation, does not violate the First Amendment but plainly promotes a substantial government interest, to wit: the furtherance of transparency and trust that line-drawing decisions are not made for improper, corrupt, or discriminatory purposes; the promotion of public confidence in the process that determines the very structure of the electoral process; and the assurance that all commissioners are involved in the decision-making (ECF No. 36 at PageID.469-472).

**The Member Plaintiffs have not shown a likelihood of success on the merits of Count IV.**

Even assuming arguendo that the Member Plaintiffs may properly raise this claim, the First Amendment rights of public officials, such as the future commissioners, are not absolute. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citation omitted). The restriction at issue applies only to official speech made by commissioners in their official capacity. "Restricting speech that owes its existence to a public employee's professional responsibilities

does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 421-22 (citing *Rosenberger*, 515 U.S. at 833 ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes")).

      e.      **Equal Protection (Count V)**

Last, the Member Plaintiffs argue that they are likely to succeed on the merits of their Equal Protection claim because the "arbitrary" and "invidious" distinctions drawn by the challenged provisions are neither justified by a compelling government interest nor narrowly tailored to achieve that purpose (Member Case, ECF No. 3 at PageID.70-73).

Secretary Benson responds that the composition of the Commission does not violate Equal Protection (ECF No. 45 at PageID.662). Reiterating her arguments in the Lead Case, Secretary Benson argues that there is more than a sufficient rational relationship between the disparate treatment of the Member Plaintiffs and the government's interests (*id.* at PageID.663-665).

**The Member Plaintiffs have not shown a likelihood of success on the merits of Count V.**

Again, "a classification neither involving fundamental rights nor proceeding along suspect lines ... cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Armour*, 566 U.S. at 680 (quoting *Heller*, 509 U.S. at 319-20). The Member Plaintiffs are unlikely to succeed in demonstrating that the eligibility criteria impose a severe burden on their First Amendment rights. And the Member Plaintiffs do not belong to any suspect classification such as race or religion. Per the allegations in their Complaint, the Member Plaintiffs are partisan candidates or elected

officials, political party officers, and/or certain close relatives of the same. For the reasons previously stated by the Court and more fully stated by Secretary Benson, the difference in treatment between persons within and outside these categories rationally furthers a legitimate state interest.

Accordingly, the Member Plaintiffs have not demonstrated a strong likelihood of success on the merits of their five claims.[5] This first preliminary injunction factor therefore balances in Defendants' favor.

## 2.    Irreparable Injury

The Member Plaintiffs briefly argue that absent an injunction, they will suffer irreparable injury by their ineligibility for participation in the Commission (ECF No. 3 at PageID.73).

Secretary Benson argues that the Member Plaintiffs have not demonstrated any irreparable injury where there is no associational or expression-based exclusion of their viewpoints (ECF No. 45 at PageID.669). Second, Secretary Benson argues that to whatever extent Plaintiffs raise a claim based on their exclusion, applications are not due until June 2020, and there is time enough to fully litigate the issues (*id.*).

VNP similarly argues that Plaintiffs have not made the necessary showing of irreparable injury where the earliest date that Plaintiffs' rights could be impacted, if at all, is June 1, 2020, the date after which the Secretary of State will no longer accept applications (ECF No. 36 at PageID.472-473). VNP asserts that simply put, "there is no reason to grant a preliminary

---

[5] The Member Plaintiffs argue that they are likely to succeed on the merits of their claims where (1) the challenged provisions "prohibit[] a substantial amount of protected expression and speech," and (2) the challenged provisions are "inextricably intertwined" and cannot be severed (ECF No. 3 at PageID.55). Given the Court's conclusion on the merits of the Member Plaintiffs' constitutional argument, the Court declines to address their argument on severability.

injunction pending a final resolution on the merits when the merits are so easily resolved before the alleged irreparable harm could ever arise" (*id.* at PageID.473).

The Court has determined that the Member Plaintiffs are unlikely to prevail on the merits of their constitutional claims. Further, Defendants' points that the Member Plaintiffs' injuries are, in fact, not irreparable absent a preliminary injunction are well taken. This factor therefore also balances in Defendants' favor.

### 3. Substantial Injury & Public Interest

The Member Plaintiffs argue that because they have shown a likelihood of success on the merits of their claims, Secretary Benson and any third party are precluded from credibly asserting that any purported harm to others or the public weighs against issuance of a preliminary injunction in this case (ECF No. 3 at PageID.74). According to the Member Plaintiffs, "there is none" (*id.*).

Secretary Benson again argues that an injunction will irreparably harm the State inasmuch as any delay in the process will effectively prevent the Secretary from completing her constitutionally-mandated tasks and will also irreparably harm Michigan's citizens in halting the expression of their collective will (ECF No. 45 at PageID.670). Secretary Benson argues that the people have a strong interest in having their Constitution effectuated (*id.*).

VNP argues that the public's interest in the proper implementation of the challenged constitutional procedure is "especially strong because the adoption of that procedure was accomplished by the clearly expressed will of the people, as manifested by the 61% vote in favor of Proposal 18-2" (ECF No. 36 at PageID.474-475).

Again, "the public interest lies in a correct application of the federal constitutional and statutory provisions upon which the claimants have brought this claim and ultimately. . . upon the will of the people of Michigan being effected in accordance with Michigan law." *Coalition to*

*Defend Affirmative Action*, 473 F.3d at 252 (internal quotation and citation omitted).  Even if the Court viewed the merits of the Member Plaintiffs' claims differently, preserving the status chosen by the voters more than one year ago is important as this case progresses through the courts toward final resolution.  These last two factors therefore balance in Defendants' favor.

In sum, the Court, in its discretion, determines that awarding the kind of relief that the Supreme Court has characterized as "extraordinary" and "drastic," *Munaf*, 553 U.S. at 690; *Platt*, 769 F.3d at 454, is also not justified in this case.  Rather, the Court denies the Member Plaintiffs' motion for a preliminary injunction.

### III.    CONCLUSION

For the foregoing reasons, a balancing of the equities weighs against preliminarily enjoining Secretary Benson from implementing the voter-approved provisions of Michigan's Constitution mandating the establishment of an Independent Citizens Redistricting Commission.  An Order will enter consistent with this Opinion.

Dated:  November 25, 2019                               /s/ Janet T. Neff
                                                 JANET T. NEFF
                                                 United States District Judge